## TABLE OF CONTENTS

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    1

I.    DEFENDANTS' MOTION FOR A *FRANKS* HEARING RELATIVE
      TO THE AFFIDAVIT SUBMITTED IN SUPPORT OF WARRANTS
      AUTHORIZING SEARCHES AND SEIZURES AT PREMISES
      LOCATED AT 1661 WAYCROSS ROAD, CINCINNATI, OHIO,
      5462 DUFF DRIVE, CINCINNATI, OHIO, AND 2500 W.
      CLIFTON AVENUE, CINCINNATI, OHIO.

      A.    Relevant Legal Principles . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    11

      B.    The Material False and Misleading Statements and
            Omissions in the Affidavit . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    12

      C.    Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    41

II.   THE COURT SHOULD SUPPRESS THE ALL THE EVIDENCE
      THE  GOVERNMENT OBTAINED, DIRECTLY AND INDIRECTLY,
      FROM THE DEFENDANTS' INTERNET SERVICE PROVIDERS
      UNDER THE FOURTH AMENDMENT AND/OR TITLE III . . . . . . . . . . . .    42

      Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    42

      A.    The ISP "Preservation" Requests and Subpoenas . . . . . . . . . . . . . . . .    43

            1.    The Unlawful October "Preservation" Request To NuVox . . . .    43

            2.    The Unlawful December, 2004 Grand Jury Subpoena to Verio    46

            3.    The January, 2005, Unlawful §2703(b)(1)(B)(i) Subpoenas . . .    47

            4.    The May, 2005, Unlawful §2703(b)(1)(B)(ii) Subpoena/2703(d)
                  Order . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    49

            5.    The September, 2005, Unlawful §2703(b)(1)(B)(ii) Subpoenas/
                  2703(d) Order . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    52

      B.    The Fourth Amendment Violations and Taint Hearing . . . . . . . . . . . . .    54

      C.    The "Good Faith" Exception to the Exclusionary Rule . . . . . . . . . . . . .    56

      D.    Additional Email Seizures . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    61

III.    ALL EVIDENCE SEIZED DURING THE SEARCHES PURSUANT TO
        WARRANTS OF PREMISES OF BERKELEY PREMIUM
        NUTRACEUTICALS, INC.  LOCATED AT 1661 WAYCROSS ROAD,
        CINCINNATI, OHIO, 5462 DUFF DRIVE, CINCINNATI, OHIO, AND
        2500 W. CLIFTON AVENUE, CINCINNATI, OHIO, ON MARCH 16, 2005,
        AS WELL AS ALL EVIDENCE DERIVED THEREFROM, MUST BE
        SUPPRESSED BECAUSE OF THE OUTRAGEOUS MANNER IN
        WHICH THE WARRANTS WERE EXECUTED . . . . . . . . . . . . . . . . . . . . . .    61

IV.     ALL EVIDENCE SEIZED DURING THE SEARCHES PURSUANT
        TO WARRANTS OF PREMISES OF BERKELEY PREMIUM
        NUTRACEUTICALS, INC.  LOCATED AT 1661 WAYCROSS ROAD,
        CINCINNATI, OHIO, 5462 DUFF DRIVE, CINCINNATI, OHIO, AND
        2500 W. CLIFTON AVENUE, CINCINNATI, OHIO, ON MARCH 16, 2005,
        AS WELL AS ALL EVIDENCE DERIVED THEREFROM,
        MUST BE SUPPRESSED BASED UPON FACIAL DEFECTS IN THE
        WARRANTS AND AFFIDAVIT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    67

        A.    Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    67

        B.    Defendants Had A Reasonable Expectation of Privacy
              in the Premises Searched and the Items Seized . . . . . . . . . . . . . . . . . . .    68

        C.    The Affidavit Failed to Establish Probable Cause for These Searches . .    69

              1.    Probable cause in general  . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    70

              2.    Absence of probable cause regarding federal mail and wire fraud    72

                    a.    The allegations regarding auto-ship fraud . . . . . . . . . . .    72

                          i.    The allegations do not demonstrate probable
                                cause to believe that the elements of *criminal*
                                fraud were present . . . . . . . . . . . . . . . . . . . . . . .    72

                          ii.   The allegations regarding BBB complaints do
                                not contribute to a finding of probable cause . . .    74

                          iii.  Auto-ship programs are not reflective of
                                fraudulent intent . . . . . . . . . . . . . . . . . . . . . . . .    75

                          iv.   Almaguer's unsupported speculation cannot
                                support a finding of probable cause . . . . . . . . . .    77

ii

         v.     The allegations regarding returned products do
not contribute to a finding of probable cause . . .    77

         vi.    The allegations regarding chargebacks do
not support a finding of probable cause . . . . . . .    78

         vii.   Information from unidentified employees
and former employees cannot contribute to
a finding of probable cause because of the
absence from the affidavit of any basis on which
the Magistrate Judge could have made an
independent determination of their veracity,
trustworthiness, and basis of knowledge or of any
independent corroboration of their statements . . . .    80

         viii.  Allegations regarding decline recovery also do
not support a finding of probable cause . . . . . . . . .    82

     b.     The allegations of misrepresentations regarding products    83

  3.     Absence of probable cause regarding money laundering . . . . . . .    85

  4.     Absence of probable cause of FDCA violations . . . . . . . . . . . .    85

D.   The Warrants Were Both Overbroad and Violated the
Fourth Amendment Particularity Requirement . . . . . . . . . . . . . . . . . . .    87

  1.     The Fourth Amendment Particularity Requirement . . . . . . . . .    89

  2.     The Fourth Amendment Overbreadth Prohibition . . . . . . . . . .    90

  3.     Particularity and Overbreadth Defects Common to Paragraphs    91
        1-24, 29 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

     a.     Particularity . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    91

         i.     Failure to limit the items to be seized to
evidence of federal wire fraud, mail fraud,
money laundering, and FDA violations . . . . . .    91

         ii.    Failure to limit the warrants by reference to
the alleged criminal conduct described in the
affidavit . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    92

        b.     The common overbreadth defects of paragraphs
1-24, 26-29 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 94

           i.     Failure to confine the scope of the warrant to
the alleged criminality addressed in the
affidavit . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 94

           ii.    Failure to provide any temporal limitation on
the scope of the seizures . . . . . . . . . . . . . . . . . 95

    4.     Additional Particularity and Overbreadth Defects . . . . . . . . . 95

    5.     The warrants must be invalidated in their entirety . . . . . . . . . 108

E.    All Evidence Derived from Searches of Computers, Computer
Disks, and Other Electronic and Digital Storage Media Seized
Must Be Suppressed . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 109

    1.     The affidavit failed to establish probable cause for the
seizure of all computers or their contents and all storage
media and devices . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 111

    2.     The affidavit failed to establish the necessity for the
wholesale seizure of computers, their contents, and
storage media for their later search without judicial
supervision . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 112

    3.     The warrants were overbroad and insufficiently particularized
with respect to the computer-related seizures and later searches 114

    4.     The warrants authorized general searches in violation
of the Fourth Amendment . . . . . . . . . . . . . . . . . . . . . . . . . . 116

    5.     The warrant authorized an unreasonable search within the
meaning of the Fourth Amendment because it did not impose
a reasonable temporal limitation on the time frame within
which the government would be required to search the material
for the items within the scope of the warrant but instead
permitted the government to maintain indefinite possession of
the entirety of the seized materials . . . . . . . . . . . . . . . . . . . . . . 124

F.    The *Leon* Good Faith Exception Cannot Save These Searches from
Application of the Fourth Amendment Exclusionary Rule . . . . . . . . . . 125

V.     ALL EVIDENCE DERIVED FROM SEARCHES OF
LAPTOPS/COMPUTERS BELONGING TO BPN WHICH WERE
TURNED OVER TO THE GOVERNMENT BY PRESENT OR
FORMER EMPLOYEES MUST BE SUPPRESSED . . . . . . . . . . . . . . . . .      128

     A.      BPN and Warshak Had a Reasonable Expectation of Privacy in
the Laptops and Their Contents . . . . . . . . . . . . . . . . . . . . . . . . . . . .      130

     B.      Factual Background . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .      133

     C.      The Surrender of the Laptops to the Government Was the
Direct Fruit of the Unlawful March 16, 2005, Searches . . . . . . . . . .      132

     D.      The Employees Were Acting as Government Agents in Giving the
Government BPN Laptops and Permitting Government Agents
to Search Their Contents or Searching Their Contents
Themselves to Provide Documents to the Government . . . . . . . . . . .      135

     E.      The Warrantless Searches of the BPN-Owned Laptops Cannot Be
Justified Under a Consent Theory . . . . . . . . . . . . . . . . . . . . . . . . . . .      136

         1.      These individuals did not voluntarily consent to the searches
of BPN laptops . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .      136

         2.      These individuals did not have actual authority to consent
to the search of BPN's laptops . . . . . . . . . . . . . . . . . . . . . . .      138

         3.      Government agents could not have reasonably believed that
these individuals had authority to consent to the searches of
the laptops . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .      140

VI.     ALL EVIDENCE SEIZED AS THE RESULT OF SEARCHES OF
TWO LAPTOPS IMAGED PURSUANT TO A WARRANT ISSUED ON
MARCH 1, 2005, AND ALL EVIDENCE DERIVED THEREFROM,
MUST BE SUPPRESSED . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .      143

     A.      Factual Background . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .      143

         1.      Boone County Seizure of Computers From Teegardens'
Residence . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .      143

         2.      Almaguer's involvement in Carol Teegarden's antecedent
federal prosecution for bankruptcy fraud and witness tampering      145

3.     Almaguer gets access to computers seized from Teegarden residence . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 146

B.    BPN and Warshak Had A Reasonable Expectation of Privacy in the Laptops . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 147

C.    The Kentucky Search Warrant Rests Upon Antecedent Illegal Searches and Seizures . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 148

1.     The seizure of the computers was a pretext . . . . . . . . . . . . . . . 148

2.     The search of the computers by State officials for evidence related to Almaguer's federal investigation was outside the scope of the Boone County warrant and an unconstitutional warrantless search . . . . . . . . . . . . . . . . . . . . . 153

D.    The Affidavit Failed to Establish Probable Cause for These Searches . 155

1.     Absence of probable cause regarding federal mail/wire fraud . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 156

2.     Lack of probable cause nexus . . . . . . . . . . . . . . . . . . . . 156

E.    The Kentucky Search Warrant Suffers from the Same False And/or Recklessly Misleading Statements as the March 14, 2005, Affidavit for BPN, and Other Infirmities . . . . . . . . . . . . . . . . . . . . . . . 158

F.    The Warrant Was Both Overbroad and Violated the Fourth Amendment Particularity Requirement . . . . . . . . . . . . . . . . . . . . . . . . 160

G.    The Kentucky Search Warrant authorized only the seizure of the computers, not a search of their contents . . . . . . . . . . . . . . . . . . . . 161

H.    If the warrant did authorize the search of the computers, it authorized general searches in violation of the Fourth Amendment . . . 162

I.    The Kentucky Search Warrant did not impose a reasonable temporal limitation regarding any searches of the computers . . . . . . . . 163

J.    The *Leon* Good Faith Exception Cannot Save These Searches from Application of the Fourth Amendment Exclusionary Rule . . . . . . . . . 163

K.    Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 163

VII.   THE INDICTMENT MUST BE DISMISSED BECAUSE OF THE
GOVERNMENT'S IMPROPER EXPLOITATION OF PARALLEL
CIVIL PROCEEDINGS TO OBTAIN EVIDENCE FOR THE CRIMINAL
CASE AGAINST DEFENDANTS OR, ALTERNATIVELY, ALL
EVIDENCE SO ACQUIRED, AND ALL DERIVATIVE FRUITS THEREOF,
MUST BE SUPPRESSED . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   165

    A.   Preliminary Statement of the Facts . . . . . . . . . . . . . . . . . . . . . . . . . . . .   166

        1.   Stalking Horse Number One:  The Federal Trade
Commission Investigation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   166

        2.   Stalking Horse Number Two:  The Multi-state
Attorneys General Investigation . . . . . . . . . . . . . . . . . . . . . . . . ..   178

        3.   Stalking Horse Number Three:  The Food and Drug
Administration Inspection . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   181

        4.   The Beneficiaries:  Postal Inspector Almaguer and
the BPN Criminal Investigators . . . . . . . . . . . . . . . . . . . . . . . . . . . 181

    B.   The Court Should Enter an Order Suppressing All Evidence
Obtained or Derived from the Joint Civil Investigations and
Should Dismiss the Indictment Based on Cumulative Evidence
of Government Misconduct . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   185

        1.   The Government's Use of "Parallel Proceedings" is on the Rise   185

        2.   The government may not bring parallel civil proceedings to
avail itself of civil discovery devices to unfairly obtain
evidence for subsequent criminal prosecution . . . . . . . . . . . . . . .   187

    C.   The Defendants Request an Evidentiary Hearing and Disclosure of
Internal Agency Documents to Further Demonstrate the Government's
Misuse of Parallel Proceedings . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   194

    D.   Any and All Evidence Obtained as a Result of the Parallel
Proceedings' Violations must be Suppressed . . . . . . . . . . . . . . . . . .   195

VIII.  ALL EVIDENCE SEIZED BY THE FDA AND ANY FRUITS THEREOF
MUST BE SUPPRESSED . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   195

    A.   A Brief Timeline of Events Related to the FDA Inspection **. . . . . . . .**   195

B.    The FDA Inspection Was a Pretext to Gather Evidence for a
      Criminal Investigation That Had Been Ongoing for Five Months . . .    198

C.    The Limited FDA Documents That Defendants Possess Demonstrate
      That the May 2004 FDA Inspection Was Not Routine and Was in
      Fact Used as a Covert Criminal Investigation . . . . . . . . . . . . . . . . . . .    202.

      1.    The Criminal investigation was already in progress . .. . . . . . .    202

      2.    The FDA inspection was conducted by two consumer safety
            officers (CSOs), who were accompanied by an FDA compliance
            officer (CO) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    202

      3.    The EIR states that samples were collected "per request
            of the Forensic Chemistry Center." . . . . . . . . . . . . . . . . . . . . . .    203

      4.    The EIR states that the FDA inspection was conducted
            "per to the Compliance Program Guidance Manual
            7321.008 'Dietary Supplement – Import and Domestic,'"
            yet the important regulatory procedures outlined in that
            FDA program regarding sample collection and analysis were
            not followed . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    205

      5.    The EIR states that the FDA inspection was conducted per
            assignment, which "originated from" two specific consumer
            complaints, yet important regulatory FDA procedures
            regarding such inspections were not followed . . . . . . . . . . . . . .    206

      6.    The EIR states that the FDA ordered BPN to keep copies
            of customer complaints, even though FDA lacked the authority
            to require BPN to establish or maintain a consumer complaint
            tracking system or to keep copies of complaints . . . . . . . . . . . .    207.

      7.    The defendants have never received copies of the complaints
            in the EIR as the grounds for the inspection . . . . . . . . . . . . . . .    210

      8.    The FDA did not perform a follow-up inspection after BPN
            sent the FDA  its letter of correction on November 5, 2004 . . .    211

      9.    The FDA issued an FD-482, which affirmatively
            misrepresented the nature of their visit . . . . . . . . . . . . . . . . . . .    212

      10.   The FDA completely failed to issue the statutorily required
            separate FD-482 Notices of Inspection for entries into

the two BPN warehouses . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 212

D.    Defendants Request an Evidentiary Hearing and Disclosure of
Additional Internal Agency Documents to Further Demonstrate
the Government's Intentional and Egregious Deception in this Case. . .   214

E.    Any and All Evidence Obtained as the Result of the FDA's Pretextual
Search Must Be Suppressed . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 215

IX.    THE GOVERNMENT'S INVASION OF THE DEFENSE CAMP BY
INTERROGATING PROFFERING WITNESSES REGARDING SUBJECTS
PROTECTED BY THE JOIN DEFENSE, COMMON INTEREST, AND
CORPORATE ATTORNEY-CLIENT PRIVILEGES REQUIRES DISMISSAL.  217

X.    THE INDICTMENT MUST BE DISMISSED WHERE THE GOVERNMENT
VIOLATED THE SECRECY PROVISIONS OF FED. R. CRIM. P. 6(e) . . . . . . 223

XI.    THE GOVERNMENT'S MISCONDUCT, VIEWED IN THE
AGGREGATE, CONSTITUTES "OUTRAGEOUS" CONDUCT
THAT JUSTIFIES DISMISSING THE INDICTMENT WITH PREJUDICE . . . . .228.

XII.    COUNT 111 MUST BE DISMISSED . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 240

A.    Count 111 Fails to Plead an Essential Element of 18 U.S.C. § 1505,
the Existence of a "Pending" Agency "Proceeding." . . . . . . . . . . . . . . . 240

B.    Count 111 Should Be Dismissed Because the FDA Inspection Was a
Pretext . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 246

XIII.    COUNTS 15, 23 AND 27 OF THE INDICTMENT ALLEGING BANK FRAUD
MUST BE DISMISSED WHERE THE GOVERNMENT HAS FAILED
TO ALLEGE FACTS SUFFICIENT TO MEET THE ELEMENTS OF BANK
FRAUD . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 248

XIV.    COUNT 108 OF THE INDICTMENT MUST BE DISMISSED AS IT IS
DUPLICITOUS IN VIOLATION OF DEFENDANT STEVEN
WARSHAK'S FIFTH AMENDMENT RIGHT TO BE FREE
FROM DOUBLE JEOPARDY, AND MUST BE DISMISSED . . . . . . . . . . . . . 250

XV.    COUNTS 30 AND 31 OF THE INDICTMENT CHARGING
       CONSPIRACY TO LAUNDER MONEY ARE MULTIPLICITOUS
       AND AS A RESULT ONE COUNT MUST BE DISMISSED . . . . . . . . . . . . . .   253

XVI.   ALL PRIOR *EX PARTE* SUBMISSIONS MUST BE UNSEALED
       AND DISCLOSED TO THE DEFENDANTS . . . . . . . . . . . . . . . . . . . . . . . . . .   254

XVII.. MOTIONS  *IN LIMINE* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .267. . . . . . . . . . . . . . .

       A.     The Audio Recording and Transcript Constitute "Other Acts"
              Evidence in Violation of Federal Rule of Evidence 404(b).
       B.     The Audio Recording and Transcript are Not Trustworthy . . . . . . . . . . .   269

       C.     The Audio Recording and Transcript are Not Material to the
              Crimes Charged . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   270

       D.     Alternatively, the Probative Value of the Audio Recording
              and Transcript is Substantially Outweighed by Its Prejudicial
              Effect . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   271

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | |
| | : | |
| *Plaintiff,* | : | |
| | : | Crim. Action No. 06-CR-00111-SAS |
| v. | : | |
| | : | Senior Judge S. Arthur Spiegel |
| STEVEN WARSHAK, *et al.*, | : | |
| | : | |
| *Defendants* | : | |
| _____ | : | |

"The true danger is when liberty is nibbled away, for expedients, and by parts."
--- Edmund Burke

.

### INTRODUCTION

The defendants today, in a joint consolidated motion and memorandum, challenge, on constitutional grounds, the myriad of investigative methods used by the government during its three year investigation which resulted in the indictment in this case. The defendants have attempted, through this joint filing, to narrow the issues and focus the Court only on the most constitutionally impermissible intrusions into their reasonable expectations of privacy. Some of the intrusions upon which this prosecution is based were traditional: a series of invasive searches and seizures that the defendants will demonstrate were pursuant to warrants based on affidavits of case agent Alejandro Almaguer – a Postal Inspector with only 16 months at the job - that were saturated with material misstatements of fact, were replete with erroneous and misleading conclusions, and which repeatedly omitted truthful, material and exculpatory information all in reckless disregard for the truth. The net result of these misstatements and omissions was to deprive the Magistrate Judge of the ability to

fairly and independently determine whether or not to authorize the warrants that Almaguer was seeking. The showings of false statements and material omissions in Section I, *infra*, should require a broadening of the evidentiary hearings currently scheduled to begin September 27, 2007, under the Supreme Court's *Franks v. Delaware* decision.

Separately, the very same warrants violated the Fourth Amendment in that they provided so little meaningful or limiting guidance to the executing officers that they seized, literally, 3 truck loads containing 7 *tons* of documents from an ongoing business employing at its height over 1,000 residents of the community. *See* Section IV(D), *infra*. Pursuant to the same warrants, more than 90 computers and the company's servers were either seized or copied, all to be searched in their entirety – *without any limit* - at the discretion of the postal inspectors, without any judicial supervision and without any particularization that would prevent the investigators from accessing data utterly unrelated to the objectives of their criminal investigation. The March 16, 2005, warrants were executed by more than 50 armed agents who entered the business premises of Berkeley Premium Nutraceuticals, rounded up and detained all the employees, kicked in office doors, prevented corporate counsel from conferring with corporate executives, tipped off the media to the search before it occurred, and unnecessarily and egregiously intimidated the innocent workers at the Berkeley call center and warehouses, as will be demonstrated by affidavits submitted with the motions and memoranda. The egregiously excessive execution of the warrants, as well as Almaguer's presentation of an affidavit featuring a staggeringly distorted view of Berkeley's business practices, which in virtually all respects had been – and certainly by March, 2005 were known to the case agents to be – fully within industry norms, reflects an investigation led by a first year postal inspector that can only be characterized as out of control. All of the evidence seized from

2

Berkeley on March 16, 2005, must be suppressed.

The methods of the government were not limited to the over-intrusive, over-broad, unconstitutionally acquired warrants of March, 2005. The investigative case agents also employed an array of internet "special investigative techniques" that violated both the Fourth Amendment and the Stored Communications Act of 1986. As conclusively determined by the Sixth Circuit Court of Appeals in *Warshak v United States*, the content of private emails were being illegally accessed by the case agents from internet service providers based on the issuance of orders without showings of probable cause and without prior notice to the citizens whose emails were being acquired – all in blatant violation of the privacy protections of the Fourth Amendment. Worse, the email orders (and additional secret subpoenas to the ISPs) contained no limit as would a search warrant (particularization clause) or a Title III electronic surveillance order (minimization requirement) preventing the case agents from accessing private, intimate – even spousal – emails having nothing to do with their investigation but everything to do with the secrets and confidences of the electronic communicators. In fact, the evidence will prove that the case agents not only read these private emails but utilized their knowledge of people's private lives, including, as to some, their spousal infidelities, to coerce cooperation from witnesses such as Jim Teegarden, Shelley Kinmon, and Greg Cossman – the cornerstones of the prosecution case. Additionally, these internet seizures violated statutes that were enacted to protect privacy but, as implemented by Almaguer, an internet-savvy investigator, resulted in orders to internet service providers including NuVox, Warshak's ISP, to seize "*sent*" emails which would require, because the emails were in transit, a Title III electronic surveillance order, and further resulted in a deliberate practice of violating the notice provisions of the privacy statutes, all without the judicial review required by law. This pattern of internet illegalities requires not only the suppression of the private emails acquired without proper judicial

authorization, but also the broadening of the scheduled evidentiary hearings to determine whether the testimony of witnesses like Teegarden, Kinmon, Will Bertemes and Greg Cossman and additional physical evidence derived from the internet illegalities should be suppressed. *See* Section II, *infra.*

The invasions of the defendants' rights were not limited to Fourth Amendment violations. The case agents also impermissibly exploited ongoing parallel civil investigations being conducted by the Federal Trade Commission ("FTC") and the State Attorneys General ("AG") to secretly advance their criminal investigatory objectives. *See* Section VII, *infra***.** On one hand, the normal civil regulators of a direct marketing company, the FTC and AG, issued discovery requests pursuant to their regulatory powers. Berkeley cooperated fully, believing at all times that it was, through counsel, engaged in a good faith civil negotiation that would lead, as it did with the state AGs (and with other similarly situated companies), to civil settlements of outstanding regulatory issues regarding the operation of its continuity program. Instead, in secret, throughout 2004 and up to March of 2005, the criminal case agents were exploiting the civil negotiations, using the FTC and AG to collect confidential business documents, confidential data, and other disclosures of past and present business practices from Berkeley to advance not the regulatory oversight of the FTC but instead the secret *criminal* investigation of the postal inspectors and the FBI. Likewise, the same criminal agents were advancing their investigatory agenda through the use of pretext inspections by the FDA, *see* Section VIII, *infra,* and pretext searches and seizures of Berkeley computers maintained at its COO Jim Teegarden's home through their proxies at the Boone County Sheriff's Office, *see* Section VI, *infra,* each of which is separately addressed in the consolidated joint motion and memorandum. Evidentiary hearings are requested to resolve the pivotal factual issues relating

4

to the pretextual searches and exploited civil proceedings as discussed herein.

When the alarming number of investigative illegalities are aggregated – and added to those already subject to motions to dismiss directed to the invasion of the attorney-client privilege and disclosed within the motion for discovery relating to the theft of confidential business materials and the misuse of sexual entrapment by informants – the most appropriate judicial remedy is dismissal.  When each Fourth Amendment violation, each intrusion into the privacy of citizens and companies, each executive branch acquisition of confidential attorney-client emails and documents, each exploitation of legitimate civil regulatory investigations to secretly advance a criminal investigation without notice to its targets, each pretext search, each deliberate intrusion into a joint defense agreement, *see* Section IX, *infra*,  and each violation of grand jury secrecy, *see* Section X, *infra***,** are reviewed by this court under a totality of circumstances test it "shocks the conscience," and must be deemed  a Due Process violation, and  ultimately determined, after hearing, to be the sort of government misconduct that can only be deterred by the ultimate remedy of dismissal:

> Decency, security, and liberty alike demand that government officials shall be subjected to the same rules of conduct that are commands to the citizen. In a government of laws, existence of the government will be imperiled if it fails to observe the law scrupulously. Our government is the potent, the omnipresent teacher. For good or for ill, it teaches the whole people by its example. Crime is contagious. If the government becomes a lawbreaker, it breeds contempt for law; it invites every man to become a law unto himself; it invites anarchy. To declare that in the administration of the criminal law the end justifies the means-to declare that the government may commit crimes in order to secure the conviction of a private criminal-would bring terrible retribution. Against that pernicious doctrine this court should resolutely set its face.

*Olmstead v. United States*, 277 U.S. 438, 485 (1928)(Brandeis, J., dissenting).


 The defendants regret the size of this consolidated pleading, but it results not from overzealous advocacy but instead from the magnitude of the misconduct addressed by this pleading.

5

I.      **DEFENDANTS' MOTION FOR A *FRANKS* HEARING RELATIVE TO THE AFFIDAVIT SUBMITTED IN SUPPORT OF WARRANTS AUTHORIZING SEARCHES AND SEIZURES AT PREMISES LOCATED AT 1661 WAYCROSS ROAD, CINCINNATI, OHIO, 5462 DUFF DRIVE, CINCINNATI, OHIO, AND 2500 W. CLIFTON AVENUE, CINCINNATI, OHIO.**

Because U.S. Postal Inspector Alejandro E. Almaguer ("Inspector Almaguer") submitted a search warrant affidavit replete with at minimum recklessly false statements, because he omitted numerous material facts that wholly undermined his contention that probable cause existed to search Berkeley Premium Nutraceutical's premises, and because the Magistrate Judge could not have issued the search warrant had he been apprised of the real facts regarding Berkeley Premium Nutraceutical's ("Berkeley" and/or "BPN") business affairs, the Court should convene an evidentiary hearing pursuant to *Franks v. Delaware*, 438 U.S. 154 (1978), and thereafter suppress all evidence seized by the government from the premises of Berkeley (and all derivative fruits thereof).  *See United States v. Stewart*, 306 F.3d 295, 304 (6th Cir. 2002) (If the Court's assessment is that probable cause would not exist if the false statements are excluded from the determination, then the Court "must hold a full evidentiary hearing to determine whether the affidavit was properly submitted.") *United States v. Frazier*, 423 F.3d 526, 538 (6th Cir.2005) (To be entitled to a *Franks* hearing, a defendant must make "a substantial preliminary showing that specified portions of the affiant's averments are deliberately or recklessly false" and that "a finding of probable cause would not be supported by the remaining content of the affidavit when the allegedly false material is set to aside.").

Inspector Almaguer's affidavit contains 65 paragraphs and necessarily requires detailed analysis.[1]  Generally, though, Almaguer utilized several major themes to create the false impression that probable cause existed in March 2005 to justify the issuance of a sweeping and virtually

---

[1]      The search warrants and Almaguer's affidavit in support thereof are attached hereto as **Exhibits 1 and 2**, respectively.

unlimited search warrant, including the following:

1.Almaguer was at the very least reckless in provided the Magistrate Judge with grossly misleading statistics in an attempt to convince the court that Berkeley was a criminal enterprise.  The true and complete statistics draw an entirely different portrait. For example:

●In paragraph 15, Almaguer asserted that from November 2001 to November 2004 Berkeley had more than 4200 BBB complaints, yet Almaguer did not tell the Magistrate Judge that during this three year period Warshak's companies had **at least 3,000,000 customers,** and therefore even assuming *arguendo* each complaint was filed by a different customer, it represented **less than .14% of the companies' customers, or approximately 1 complaint per 700 customers**.

●In paragraph 18, Almaguer asserted that the Sycamore Post Office reported 89,000 returned pieces of mail from March 2004 to July 2004, or an average of 17,000 pieces per month.  Almaguer failed to inform the Magistrate Judge that during the period referenced **BPN shipped at minimum 1,400,000 packages, making the returns approximately 6% of the packages shipped, a percentage well within industry norms**.

●In paragraph 21, Almaguer asserted that from January 2003 to June 2004, Berkeley had 37,855 chargebacks, which totaled $2,080,600.  Almaguer did not inform the court that during the referenced period **Warshak's companies posted approximately 4,000,000 approved sales transactions totaling approximately 179,000,000 in sales, that chargebacks during this period were less than 1%, and that chargebacks from September 2004 through March 2005 were always less than 1%.**

1. Inspector Almaguer provided the Magistrate Judge with false and/or grossly misleading assertions regarding specific business practices of Berkeley, particularly the company's auto-ship program and refund policies. For example:

● In paragraph 11, Almaguer asserts that "in general consumers who order from Warshak's companies fall into two groups," one is never told of the auto-ship program and the other is misinformed regarding the terms and conditions of the auto-ship program. These assertions are categorically untrue, as the exhibits attached to this pleading overwhelmingly demonstrate.

● In paragraph 11, Almaguer asserts that Warshak's companies made it virtually impossible to avoid being put in the auto-ship program. In fact, prior to March 14, 2005, approximately **550,000** customers bought product without an auto-ship program. In addition, of the approximately 2,810,000 customers who made at least one auto-ship order, at least **800,000 customers canceled their auto-ship order before their first paid shipment of product**, demonstrating both that they knew how to cancel their participation and that they were permitted to do so. **In short, at least 1,350,000 customers either purchased without an auto-ship program or were able to cancel their auto-ship order before the first paid shipment of product.**

● In paragraphs 10 and 11, Almaguer asserts that "Warshak's companies engage in a complex scheme to prevent consumers from canceling the automatic shipments and receiving a refund of the unauthorized charges," and that Warshak's companies made it extremely difficult to receive a refund for unauthorized charges. In paragraph 32, Almaguer asserts that customer care representatives were instructed by management to categorically deny all requests for refunds, and in paragraph 33 asserts that in December 2003 Sue Cossman issued a no-credit instruction. In fact, **BPN issued a refund of some sort to at least *250,000* customers. BPN issued at minimum $15,550,000 in refunds prior to March 14, 2005. There was more than $900,000 in refunds from December 2003 to February 2004.**

2.Inspector Almaguer conflated terms, provided the court with gross generalizations, and utilized stale information to misrepresent Berkeley as an on-going criminal enterprise, when in fact Berkeley had invested millions of dollars to resolve what it believed to be purely civil, regulatory issues. For example:

● In paragraph 6, Almaguer asserts that the US Postal and BBB received "mail fraud" complaints, that consumers complained of being "defrauded." In paragraph 22, Almaguer asserted that chargeback totals from VISA indicate that the scheme to defraud perpetrated by Warshak's companies far exceeds the complaint volume received by the Cincinnati BBB as to the number of possible victims. As an attorney and former Assistant Attorney General for the State of Ohio, Almaguer knew or should have known the elements of "mail fraud" or any criminal fraud, yet he misrepresented the nature of complaints US Postal and BBB received. Moreover, as an attorney and former state prosecutor, he knew or should have known that customer complaints are not the equivalent of a Federal mail or wire fraud offense.

●In paragraph 15, Almaguer asserts that in an interview in August 2004, a Cincinnati BBB representative stated that based on a review of complaints over the past three years, Warshak's companies had not changed their practices sufficiently to change the flow of customer complaints despite being notified of thousands of allegations of fraud by customers. This information, dated from **seven months** prior to the warrants applications, was false and misleading. Almaguer had actual access to data known to the BBB and to the FTC and elected to rely on stale information to prevent the Magistrate Judge from learning the dramatic, positive changes that were implemented before any notice of any criminal investigation. **Updated information available from the BBB would have revealed that complaints were drastically reduced:**

**Date**
**Number of Complaints**

| Date | Number of Complaints |
|---|---|
| 8/2004 | 351 |
| 9/2004 | 253 |
| 10/2004 | 107 |
| 11/2004 | 59 |
| 12/2004 | 36 |
| 1/2005 | 23 |
| 2/2005 | 18 |
| 3/2005 (3/1-3/16/05) | 12 |

4.  Inspector Almaguer failed to inform the Magistrate Judge that he had already amassed significant electronic evidence regarding the targets of his investigation, including the fact that he had obtained approximately 25,000 emails from Verio Inc. (the ISP for Berkeley) and 11,000 emails from NuVox (the ISP for Warshak) pursuant to Stored Communication Act subpoenas and/or orders, and approximately 55,000 thousand emails from the computers taken from the residence of James Teegarden.  As such, before seeking authorization for a warrant to seize virtually all of Berkeley's computers, Almaguer already possessed thousands of emails of three main targets of his investigation—Berkeley, Steven Warshak, and James Teegarden, as well as various other targets such as Wagner, Kinmon and Kellogg, yet he never informed the Magistrate Judge of these material facts.

5.  Inspector Almaguer misleadingly depicted standard practices of many major American businesses, such as continuity or auto-ship programs, decline recovery departments, and multi-step refund policies, as somehow indicative of criminal conduct by their existence alone. In fact, these polices are utilized by many major American corporations, including Disney, Columbia House, Dell Computers, Sears, Staples, and LLBean, and there is nothing criminal or extraordinary about these standard corporate practices in and of themselves.

6.  Inspector Almaguer deliberately or recklessly portrayed violations of credit card industry regulations as criminal offenses and provided false and misleading assertions regarding the credit card industry, merchant processing, VISA rules and regulations, and Warshak's companies' interaction and relationship with this industry.

The foregoing is merely illustrative.  This memorandum will, on a paragraph by paragraph basis, identify for the Court Almaguer's misstatements and/or omissions, provide the Court with the accurate and truthful facts which Almaguer misstated or omitted, and supply convincing evidence that the misstatements and omissions were either intentional or in reckless disregard of the truth. In the end, when the omitted information is added to the probable cause calculus and the false or misleading information excluded, the affidavit fails to establish probable cause for the issuance of the warrants. Indeed, with the omitted information added and the false and misleading information deleted, there is virtually nothing left in the affidavit which would even contribute to a finding of probable cause, let alone support such a finding.   In truth and in fact, BPN was and remains a legitimate company which at the time of the search warrant affidavit employed more than a thousand

10                               10

local Cincinnati residents and supplied nutritional supplements to millions of satisfied customers every year.

### A.    Relevant Legal Principles.

In *Franks v. Delaware*, 438 U.S. 154 (1978), the Supreme Court "recognized a defendant's right to challenge the sufficiency of a previously issued and executed warrant by attacking statements made in an affidavit in support of the warrant." *United States v. Stewart*, 306 F.3d 295, 304 (6th Cir. 2002). It did so "[b]ecause it is the magistrate who must determine independently whether there is probable cause, [and] it would be an unthinkable imposition upon his authority if a warrant affidavit, revealed after the fact to contain a deliberately or recklessly false statement, were to stand beyond impeachment." *Franks*, 438 U.S. at 165. To be entitled to a *Franks* hearing, a defendant must make "a substantial preliminary showing that specified portions of the affiant's averments are deliberately or recklessly false" and that "a finding of probable cause would not be supported by the remaining content of the affidavit when the allegedly false material is set aside." *United States v. Frazier*, 423 F.3d 526, 538 (6th Cir. 2005).  If the Court's assessment is that probable cause would not exist if the false statements are excluded from the determination, then the Court "must hold a full evidentiary hearing to determine whether the affidavit was properly submitted." *Stewart*, 306 F.3d at 304.

*Franks* also applies to omissions, *see, e.g., United States v. Abboud*, 438 F.3d 554, 574 (6th Cir. 2006), as well as to "technically accurate statements that have been rendered misleading by material omissions." *United States v. Grant*, 218 F.3d 72, 77 (1st Cir. 2000). Where omissions are at issue, the defendant is entitled to a *Franks* hearing if he makes "a strong preliminary showing that the affiant with an intention to mislead excluded critical information from the affidavit and [that] the omission is critical to a finding of probable cause." *Mays v. City of Dayton*, 134 F.3d 809, 816 (6th Cir. 1998)(emphasis omitted). *See, e.g., Hale v. Kart*, 396 F.3d 721, 726 (6th Cir. 2005); *United*

*States v. Atkin*, 107 F.3d 1217 (6th Cir. 1997).[2]  It is worthy of note that the reason cited by the Sixth Circuit for the limitation of omissions that will warrant a *Franks* hearing to those made with an intent to deceive is that most warrant affidavits are drafted by non-lawyers in the haste of a criminal investigation, *see Mays*, 134 F.3d at 814, who "should not be burdened with the same duty to assess and disclose information as a prosecutor who possesses a mature knowledge of the entire case and is not subject to the time pressures inherent in the warrant process." *Id.* at 16.  Here, by contrast the affiant was an attorney and former prosecutor in the Attorney General's Office, Exhibit 2 (Search Warrant Affidavit) at ¶1, who had been conducting an investigation of Warshak and BPN for more than a year, Exhibit 2 at ¶2, and as case agent had a "mature knowledge" of the entire case and was under no time pressure whatsoever.

**B.      THE MATERIAL FALSE AND MISLEADING STATEMENTS AND OMISSIONS IN THE AFFIDAVIT.**

**ALMAGUER GROSSLY MISREPRESENTED MANY STATISTICS AND RELIED ON STALE INFORMATION.**

---

**<u>Paragraph 21</u>**

**"The VISA fraud team provided a report to me that showed that for the eighteen month period from January 2003 to June 2004, VISA recorded THIRTY SEVEN THOUSAND EIGHT HUNDRED FIFTY-FIVE (37,855) chargebacks to Warshak's companies, which totaled TWO MILLION EIGHT THOUSAND SIX HUNDRED SIXTY SIX DOLLARS ($2,080,6660).**

---

This paragraph is emblematic of Almaguer's highly misleading and, at a minimum, reckless pattern of providing the Magistrate Judge with essentially meaningless numbers in a format

---

[2]      While the Sixth Circuit has indicated that a *Franks* hearing is merited in cases of omissions only in "rare instances," *United States v. Graham*, 275 F.3d 490, 506 (6th Cir. 2001); *Mays*, 134 F.3d at 815, this case involves both omissions *and* affirmative false and misleading statements. With respect to the omissions asserted in support of the defendants' motion for a *Franks* hearing, this memorandum and the supporting exhibits make a strong preliminary showing that those omissions were made by Almaguer with the intent to mislead.

intentionally designed to produce an erroneous inference of large-scale fraud.  First, during the period which Almaguer referenced, Warshak's companies posted approximately 4,000,000 transactions totaling approximately $179,000,000 in sales during the eighteen (18) month period from January 2003 to June 2004, *see* Affidavit of Bruce Vanderbush ("Vanderbush Affidavit," herein), attached hereto as Exhibit 3, at ¶¶8-9, a fact omitted by Almaguer which was critical to the Magistrate Judge's ability to make a reasoned and independent assessment of the likely import of the figures cited by Almaguer.

Second, this is one of many instances where Almaguer cited stale information to the Magistrate Judge, this time providing chargeback figures only up to June, 2004, more than eight months prior to the search warrant application. Almaguer omitted to inform the Magistrate Judge that for the period from October 2004 to the time of the search warrant application (March 2005), the number of chargebacks had been drastically reduced. Had Almaguer included updated information, it would have shown the following BPN's chargebacks ratios:

| | |
|---|---|
| October 2004 | .29% |
| November 2004 | .41% |
| December 2004 | .44% |
| January 2005 | .25% |
| February 2005 | .19% |

These reductions – and the corresponding reductions in BBB complaints, *see infra*, resulted

from BPN's extraordinary efforts in 2004 to rectify the civil, regulatory problems which had resulted from its phenomenal and rapid growth, and they were wrongfully omitted by Almaguer in his affidavit. Among other things, Berkeley voluntarily suspended the auto-ship program for four months (August 16, 2004 through December 29, 2004), *see* Affidavit of Holly Danner attached hereto as Exhibit 7, resulting in millions in lost revenue, hired one of the top FTC-related law firms in the country (Venable) to review its processes, built a million dollar database to facilitate operations, installed an expensive recording system known as "DigiVoice" that from April 20th, 2004 to March 16th, 2005 recorded approximately 4,606,513 individual calls so it could ensure sales personnel were adequately disclosing the terms and conditions of its continuity program, and created a compliance team that consisted of 116 employees at its height in August of 2004 and had a payroll of $775,246.36 from March of 2004 through March of 2005, with the goal of reviewing the recorded calls to ensure that employees were making the required disclosures, *see* Affidavit of Jason Broome attached hereto as Exhibit 4.

These omissions were part and parcel of Almaguer's effort throughout the affidavit to mislead the Magistrate Judge into believing that BPN and other Warshak companies had engaged in large-scale intentional criminal fraud and continued to do so unabated up to the time of the search warrant application, when in fact BPN had made intensive and extensive efforts to resolve the civil, regulatory issues caused by its extraordinary growth.  Almaguer totally failed to recognize the reality that a truly fraudulent company would have chargebacks far exceeding 1%--a ratio that indicates that 99% of customers did not seek chargebacks.  Almaguer had access to much if not all the necessary information regarding the changes which BPN made to reduce the number of chargebacks *and* to the information necessary to see that they had been successful—he could have interviewed any employee

14

of company (he interviewed at least nine different employees before March 2005), he could have

easily placed calls and orders from Berkeley or other Warshak companies, he could have reviewed

their websites, he had access to mountains of material provided to the FTC by BPN, he had access

to thousands of emails produced to the government by Verio (Berkeley's Internet Service Provider)

and NuVox (Warshak's ISP) as a result of subpoenas issued pursuant to the Stored Communications

Act, and he had access to thousands of emails seized from computers taken from the Teegardens'

residence by the Boone County Sheriff's Department on January 13, 2005 (images of which were

provided to Almaguer no later than March 2, 2005).

---

**Paragraph 15**

"On November 10, 2004, I spoke with Jocile Ehrlich, President of Cincinnati BBB. She stated
that for the three year period ending in November 2004, consumers across the country have
filed over FOUR THOUSAND TWO HUNDRED (4,200) complaints against Warshak's
companies with the Cincinnati BBB relating to their business practices . . . ."

---

Almaguer clearly intended the Magistrate Judge to be forcibly struck by what appeared to be

a huge volume of consumer complaints – hence his capitalization of the number. The raw number

itself is relatively meaningless.  What Almaguer omitted is that BPN and its predecessor companies

had at minimum three million (3,000,000) customers during the time period referenced (December

2001 to November 2004). Vanderbush Affidavit at ¶4.  As such, the BBB complaints, even assuming

that each complaint was filed by a different customer (which is not necessarily the case), represented

approximately .14% of the companies' customers, or approximately one complaint for every 700

customers. This would have been crucial information for the Magistrate Judge to put Almaguer's

datum into perspective and to determine just how much weight it was entitled to in the probable

15

cause calculus.

Likewise, Almaguer's assertion in Paragraph 15 that Mr. Warshak's companies rank "IN THE TOP FIVE BBB complaint recipients among all companies in the nation," *see* Paragraph 15 (capitals in original), is simply false.  Over the same 3 year period, there were dozens of nationwide companies that had the same amount or many more complaints. For example, publicly available statistics show many companies with far greater complaints during the past three years:

| Company | Link to Reliability Report | 3 Year Complaint Totals |
|---|---|---|
| Sprint  PCS | http://www.kansascity.bbb.org | 24,480 |
| Dell | http://www.centraltx.bbb.org | 12,758 |
| T-Mobile | http://www.thebbb.org | 17,049 |
| AOL | http://www.dc.bbb.org | 9,915 |
| Verizon Wireless | http://www.trenton.bbb.org | 13,203 |

---

**Paragraph 18**

**"During a five month period from March 2004 to July 2004, a review of the accounting records for the Sycamore Branch Post Office . . . indicated that Warshak's companies received approximately EIGHTY-NINE THOUSAND (89,000) pieces of returned mail, or an average of SEVENTEEN THOUSAND (17,000) pieces per month."**

---

During the five (5) month period referenced by Almaguer (March 2004 to July 2004), BPN shipped approximately one million four hundred thousand (1,400,000) orders, Vanderbush Affidavit

16

at ¶7, making the returns approximately 6% of the packages shipped, assuming *arguendo* that each piece of "returned mail" was in fact a returned product (which is not necessarily accurate). This return percentage was within the industry norm for returns for direct marketing businesses such as BPN. *See* Affidavit of Edward Mazze ("Mazze Affidavit," herein), attached hereto as Exhibit 5, at ¶19 (noting that in direct marketing/telemarketing, where customers purchase products sight unseen, generally "in less than 10 percent of the transactions, customers reconsider their purchase and want their money back."). Clearly, the figure which Almaguer cited to the Magistrate Judge was not in fact indicative of fraud, as Almaguer wanted the Magistrate Judge to believe, having placed this paragraph under the heading "SCOPE OF FRAUD – CONSUMER COMPLAINTS." Moreover, as Almaguer well knew, product returns are, contrary to the inference he sought to suggest, not necessarily or even ordinarily indicative of a scheme to defraud under the Federal mail/wire fraud statutes. Consumers return products for many reasons – for example, a change of mind, dissatisfaction with the product, or for no real reason at all. In addition, products may be returned to the shipper by the Post Office if they prove to be undeliverable.

Almaguer was, at a minimum, reckless in failing to provide the Magistrate Judge with the information necessary to properly evaluate the significance of the raw numbers set forth in the affidavit. If he did not have the information already, then he was reckless in failing to ascertain whether the inference which he was suggesting to the Magistrate Judge – that the raw numbers were an indicium of a large-volume fraudulent scheme – was in fact valid. This was, after all, not a case in which haste was required; Almaguer had all the time he needed to ensure the accuracy and completeness of the affidavit. *See, e.g., Alvarez*, 127 F.3d at 375 (concluding that omission of facts was not merely negligent where no indication of any exigency which would have prevented the affiant from setting out the facts).

<div style="border:1px solid black; padding:10px;">

**Paragraph 9**

**Almaguer interviewed "several" consumers who filed complaints and found their experience "similar to dozens of BBB consumer complaints" he examined.**

</div>

As noted, Almaguer did not tell the Magistrate Judge that BPN had at minimum 3,000,000 customers.  *See* Vanderbush Affidavit at ¶4 (finding approximately 3,000,000 customers from December 2001 to November 2004).  Additionally, though, Almaguer omitted the fact that Berkeley was one of the fastest growing companies in the country, going from approximately 26,000 calls in 2001 to almost 8,000,000 calls in 2004; going from approximately 4 employees to approximately 1500 employees at its zenith.  Clearly, the "several" customers interviewed by Almaguer  and "dozens" of complaints reviewed by him represented an infinitesimal drop in the bucket, yet Almaguer omitted to provide the Magistrate Judge with information which was critical to the Magistrate Judge's ability to make an independent determination of probable cause rather than one based upon Almaguer's unwarranted and misleading generalizations. *See, e.g., United States v. 1328 North Main Street*, 713 F.Supp. 1495, 1510 (S.D.Ohio 1988)(affiant acted in reckless disregard where he included the units prescribed by physician and alleged that he prescribed excessively but omitted any information relating the number of units to the physician's patient load, the manufacturer's suggested daily dosage because the number of drugs purchased was meaningless without any indication of the amount of drugs which could have been legitimately prescribed during the relevant period).

## ALMAGUER GROSSLY MISREPRESENTED BERKELEY'S AUTO-SHIP OR CONTINUITY PROGRAM.

<div style="border: 1px solid black;">

### Paragraph 11

**"In general consumers who order from Warshak's companies fall into two groups. The first group is never told of the auto-ship program. The second group is informed of the auto-ship program; however, Warshak's companies would misrepresent the terms and conditions of the auto-ship program."**

</div>

This statement is simply false. The statement, cast in the present tense, represents a flat pronouncement that essentially no BPN customers were being properly advised of the auto-ship program up to the time of the warrant application. As Almaguer well knew or should have known, this was categorically untrue. The terms and conditions were properly disclosed in scripts, on the companies' websites, and in its marketing materials, many of which were provided to the FTC and therefore available to Almaguer. *See* Exhibit 6 (includes July 2004 script, March 2005 script, June 2004 website snapshots). In addition, continuity inserts were included with customer orders, disclosing the terms of the program and providing cancellation information, mailers were sent with orders explaining the terms of auto-ship membership and providing cancellation instructions, and catalogs which were included with customers' orders detailed the terms and conditions of the continuity program and explained which purchases would automatically enroll them in the program. BPN and Warshak's other companies invested huge amounts of money, including the hiring of the Venable law firm, to ensure that its scripting passed civil, regulatory muster, a standard far removed from a Federal mail or wire fraud offense.

19

---

**Paragraph 11**

" Warshak's companies made it virtually impossible to avoid being put in the auto-ship program. Once in the auto-ship program, Warshak's companies made it extremely difficult to receive a refund of the unauthorized charges."

---

This was, as Almaguer also had reason to know, untrue. For example, as Almaguer knew or had access to information from which he should have learned, from August 16, 2004, until December 29, 2004, BPN had no auto-ship programs *at all* for new orders. *See* Exhibit 7 (Affidavit of Holly Danner). Moreover, according to the analyses conducted by Pricewaterhouse Coopers, through March 14th, 2005, at minimum five hundred fifty thousand (550,000) BPN customers never made an auto-ship order. Vanderbush Affidavit at ¶10. Additionally, of the approximately two million eight hundred ten thousand (2,810,000) that customers made at least one auto-ship order, at least eight hundred thousand (800,000) cancelled an auto-ship order before their first paid shipment of product, *Id*. at ¶11, demonstrating both that they knew how to cancel their participation and that they were permitted to do so. In short, through March 14, 2005, at least 1,350,000 customers either purchased without an auto-ship program or were able to cancel their auto-ship order before the first paid shipment of product. Vanderbush Affidavit at ¶12. The misleading nature of Almaguer's accusation and his knowledge of it are shown by his reference in paragraph 12 to the auto-ship program's accounting for 67% of revenue, not 90 or 100%.

20

---

**Paragraph 16**

"**Based on information given to affiant from a confidential source on March 4, 2005, Warshak's companies continue to engage in the auto-ship program,** *i.e.,* **the practice of placing customers on automatic shipments without the customers' knowledge and consent.**"

---

The statement is highly misleading in two ways.  First, throughout his affidavit, Almaguer attempts to create the impression that all auto-ship programs are inherently suspect.  *See, e.g.*, Exhibit 2 (Almaguer Affidavit) at ¶¶10, 11, 12, 16. In truth and in fact, engaging in an auto-ship program is perfectly legitimate and lawful. *See* Mazze Affidavit at ¶¶21, 26-30.  Auto-ship programs, sometimes referred to as "continuity programs," are a commonly utilized and entirely legitimate business practice, in which customers agree, generally upon making their first purchase at a reduced price or accepting an offer of a free product upon payment of shipping and handling only, to accept future periodic shipments of the product and to permit their credit cards to be charged for the future shipments.  *See* Mazze Affidavit at ¶¶26-30.  Examples of well-known companies that employ auto-ship programs include BMG Music, Scholastic Book of the Month Club, Columbia House, Disney Wonderful World of Reading Club, Jenny Craig, NutriSystem, Service Master and Time Warner. *See* Mazze Affidavit at ¶26.  Almaguer must have been aware of the general legitimacy of such marketing methods, yet he sought to convey the misleading impression that auto-ship programs are *per se* illegal.  *See, e.g., 1328 North Main Street*, 713 F.Supp. at 1506-07 (in affidavit alleging doctor prescribed a patient controlled substances without an office examination, was critical omission not to tell Magistrate Judge that patient had terminal cancer and was too ill to come to the office; was also critical omission not to tell Magistrate Judge that affiant had no means of knowing whether the doctor had performed physical exams of patients where allegations were based solely on DEA surveillance).

Second, what makes the conduct potentially blameworthy is the gloss that follows the "i.e.,"

in Paragraph 16, which falsely equates auto-ship programs with a lack of knowledge or consent by the customers. If what follows the "i.e." is Almaguer's addition to the confidential source's statement, as it appears to be, then this paragraph is highly misleading, as it suggests that the confidential source said that customers were not being informed of the program, when in fact this was not the confidential source's statement but Almaguer's conclusion. If, on the other hand, the entire statement represents what the confidential source told Almaguer, then Almaguer was at the very least reckless by including the information following the "i.e." because it simply was not true—Warshak's companies were not systematically placing customers in the auto-ship program without their knowledge and consent. In fact, as Almaguer knew or should have known, major changes had been made to the auto-ship programs to ensure that civil, regulatory problems which had earlier confronted the companies would not be repeated and, indeed, the auto-ship program had been eliminated entirely for approximately four months in 2004 (August 16, 2004 to December 29, 2004) for the express purpose of revamping it to ensure that customers were properly informed.

| **Paragraph 29**: "According to interviews with current and former employees, the Sales Representatives were instructed at various times not to disclose to customers that they would be automatically "enrolled" in the auto-ship program. One of these instructions coincided with a large-scale media advertising campaign for Avlimil around April 2003. A sales representative we interviewed who worked from the start of the April 2003 Avlimil sales campaign was instructed not to disclose the auto-ship program to telephone customers until approximately August 2003." | **Paragraph 42**: "Shortly after the launch of Avlimil, Warshak's companies were experiencing exceedingly high chargebacks due to their failure to inform customers of the auto-ship program." |

In truth and in fact, there were never any systematic failures to disclose the auto-ship program

22

to telephone customers on the instructions of company management between April and August, 2003, as Almaguer indicates there was.  *See, e.g.,* Exhibit 8 (includes disclosures of Avlimil continuity program).  As a result of document productions to the FTC and Stored Communications Act subpoenas and/or orders, Almaguer had access to BPN emails which showed concerted effort on the part of management to ensure that sales representatives were making the proper disclosure. For example, in November 2003, Warshak sent an email to Jim Teegarden asking him to post memos reminding employees that they would face termination if they did not properly disclose the auto-ship program.  *See* Exhibit 9 (November 2003 email).  Another example is a March 2004 email from James Teegarden to Shelley Kinmon, who headed BPN's sales department, requesting that she send a "very loud and clear message" to sales managers that if they were not willing to terminate employees who did not read the disclosure statement, they themselves risked termination. *See* Exhibit 9 (March 2004 email).

**ALMAGUER GROSSLY MISREPRESENTED BERKELEY'S REFUND PRACTICES.**

| | |
|---|---|
| **Paragraph 10: "Warshak's companies engage in a complex scheme to prevent consumers from canceling the automatic shipments and receiving a refund of the unauthorized charges."[3]** | **Paragraph 32: "According to these employee interviews Customer Care representatives were instructed by management to categorically deny all requests for refunds. Instead, Customer Care representatives were instructed to offer free products, or sell additional products in order to keep the customers. Warshak's companies developed an elaborate credit request process, which had the effect of delaying and discouraging customers from receiving their refunds."** |

---

[3]

    Almaguer made a similar averment in Paragraph 35 ("Customers who complained to Warshak's companies that they (1) were not informed of the auto-ship process and (2) did not authorize the credit card charges were often not given credits for the unauthorized charges.").

23

Warshak's companies did not prevent cancellations (as figures detailed in preceding section patently demonstrate), they issued millions in refunds and certainly did not categorically deny requests for refunds, and it is customary and appropriate for a company to utilize a multi-step refund process. [4]

First, BPN issued a credit of some sort to at least *250,000* customers and issued at minimum fifteen million five hundred fifty thousand dollars ($15,550,000) in refunds to customers through March 14th, 2005. Vanderbush Affidavit at ¶5. These figures totally undermine Almaguer's repeated assertions—in these paragraphs and elsewhere—that BPN categorically refused to issue or made it "extremely difficult" for customers to obtain refunds. Refunds were frequent occurrences, and there was no scheme to prevent them. Almaguer omitted critical information regarding refunds which was inconsistent with his inaccurate and misleading portrayal of a company which would do anything to avoid processing cancellations and giving refunds (even suggesting that BPN and other Warshak companies only gave refunds when forced to do so by BBB complaints or through credit card chargebacks). Almaguer had available to him substantial information based upon which he had to have known, or was reckless in not knowing, that BPN and other Warshak companies in fact accepted cancellations and made refunds with much greater frequency and regularity than he led the Magistrate Judge to believe, including but certainly not limited training manuals and customer care

---

[4]

Handling consumer calls regarding cancellation of automatic shipments was one of the primary functions of the Customer Care Department. In January, 2004, that department had 144 hourly employees and 18 salaried employees and was available to take customer calls 24 hours a day, 7 days a week; in June, 2004, it had 280 hourly employees and 29 salaried employees and was available from 8:00 am until midnight, Monday through Saturday; and in March, 2005, it had 79 hourly employees and 8 salaried managers and was available from 8:00 am to 8:00 pm, Monday through Friday. *See* Exhibit 10 (Affidavit of Bonny Luther). The staffing levels of the Customer Care Department and the hours of availability are plainly not those of a company determined to refuse cancellations and deny refunds to its customers. In the affidavit, Almaguer professed himself knowledgeable about the Customer Care Department, yet he omitted any information about it which would have undermined his effort to convince the Magistrate Judge that BPN was totally or almost entirely fraudulent and continued to be so up to the time of the warrant application.

24

scripts and policies to which he had access.[5]

Second, these paragraphs are predicated upon the false implication, communicated to the Magistrate Judge, that all denials of refunds to customers who complained were the victims of an intentional scheme to defraud. Customers were in fact informed of the auto-ship program in many ways, as detailed *supra*, and simply because a customer said that a charge was unauthorized does not mean that it was in fact unauthorized. A customer may have misunderstood, may have simply changed his mind, or may have forgotten, and a merchant who does not simply accept customer complaints at face value and automatically grant refunds to all who request them, without investigation, does not thereby commit Federal mail/wire fraud. The customer, contrary to the implication communicated to the Magistrate Judge by Almaguer, is *not* always right. *See* Affidavit of Mark Wheeler ("Wheeler Affidavit," herein), attached hereto as Exhibit 11, at ¶¶11-13 (discussing the chargeback process and that customers are often mistaken in their belief they did not authorize a transaction).

Third, multi-step refund polices and/or strategies to "save the sale" are standard business practices of many American corporations, *see* Mazze Affidavit at ¶25, and are entirely lawful. Almaguer acted, at a minimum, in reckless disregard for the truth when he implied that it was fraudulent when a company attempts to retain a customer by offering him incentives to remain a customer (rather than immediately agreeing to a refund and cessation of the customer relationship when the customer telephones to seek a refund). It is not uncommon for companies to make substantial investments to develop and implement procedures to maximize the likelihood of

---

[5] Indeed, even the individuals interviewed by Almaguer gave him reason to know that refunds were not categorically rejected. For example, Vanessa Lackey told Almaguer during a September 24, 2004, interview that when she took over the department there were $70,000 to $80,000 issued daily in credits, and by the time she had left they had risen to $85,000 to $100,000 per day.

25

customer retention. *Id.* Berkeley's policy was to grant refunds to those customers who declined the offered alternatives and who were rightfully entitled to refunds, as the refund data detailed above plainly shows.

| **Paragraph 33**: "According to interviews of former employees, in or about December 2003, Sue Cosssman, sister to Steve Warshak, and an upper level management employee, issued a 'no credit' instruction, which meant that the Customer Care Department representatives had to deny all requests from customers – regardless of the merits of the request." | **Paragraph 34**: "Warshak's companies would frequently issue instructions to the Customer Care Department to limit credits to a certain dollar figure per day or per week. Supervisors threatened Customer Care representatives with the loss of their jobs if they issued too many credits."<br><br>**Paragraph 35**: "According to interviews of a former employee, the decision to issue credits was based solely on a quota system of whether too many credits had already been issued for that time period." |
|---|---|

Almaguer has intentionally or recklessly portrayed short-term, transient orders regarding refunds as an intentional scheme to deny legitimate requests for refunds. Sue Cossman's December 2003 instruction, identified in Paragraph 33 above, was precisely such a short-term directive intended to assist the company in bringing under control the problems in the Customer Care Department which were resulting in, for example, thousands of customers receiving double refunds – one from the company and another through a credit card chargeback. The fact that there was more than $900,000 in refunds from December 2003 to February 2004, and no month in this time period with less than $200,000 in refunds issued, demonstrates the transient nature of the order. Vanderbush Affidavit at ¶6.

Almaguer's assertions in paragraphs 34 and 35 that credits were given on a quota system subject to fixed limits for particular time periods was a reckless distortion of the truth. As

26

information available to him demonstrated, the so-called "quota" system was in actuality the sort of cash-flow management that is common in the industry – not *denying* credits as part of a fraudulent scheme, but *processing* them in set daily amounts.

### ALMAGUER RELIED UPON STALE INFORMATION TO MISLEADINGLY ASSERT THE EXISTENCE OF AN ONGOING CRIMINAL OPERATION.

> ### Paragraph 15
>
> **"In an interview in August 2004, a Cincinnati BBB representative stated that based on a review of complaints over the past three years, Warshak's companies had not changed their practices sufficiently to change the flow of customer complaints despite being notified of thousands of allegations of fraud by customers."**

Updated information available from the BBB would have revealed a drastically reduced number of complaints, to the point where complaints had virtually ceased by March, 2005. Had Almaguer checked with the BBB in March, 2005, rather than relying on the stale assessment of an unnamed BBB representative from seven months prior, he would have discovered that BPN had drastically reduced BBB complaints from August 2004 forward:

| Date | Number of Complaints |
|------|----------------------|
| 8/2004 | 351 |
| 9/2004 | 253 |
| 10/2004 | 107 |
| 11/2004 | 59 |
| 12/2004 | 36 |
| 1/2005 | 23 |

| 2/2005 | 18 |
|---|---|
| 3/2005 (3/1-3/16/05) | 12 |

This data vividly demonstrates that there had been major changes in BPN's operations.

Relying on stale information and omitting all evidence of Berkeley's changed practices was critical for at least two reasons. First, it falsely suggested that Warshak's companies were doing nothing to change their practices, when in fact they had been and were. Second, it falsely suggested that the same volume of customer complaints continued up to the time of the applications, thus providing apparent justification which did not actually exist for seizures of records and other documents up to the time of the execution of the warrant. *See United States v. Rice*, 478 F.3d 704, 711 (6th Cir. 2007)(upholding district court conclusion that affiant acted recklessly where affidavit would have led issuing judge to erroneous conclusion).

This paragraph is fundamentally misleading in another way as well, as it is predicated upon the incorrect assumption that all BBB complaints contain allegations of *fraud*. As referenced earlier, customers may make complaints for many reasons, and not all consumer complaints are justified. Even as to those complaints which are justified, not every complaint is related to fraud, not every complaint of fraudulent conduct is the product of the sort of intentional scheme to defraud required by the Federal mail and wire fraud statutes and, even with respect to complaints which may appear to arise from intentional fraud, not all of those complaints necessarily result from an institutionalized company practice authorized by Warshak or approved by BPN.   While all of this would be evident to any fraud investigator, Almaguer entirely failed to qualify his attribution of all the customer complaints to fraud.

28

---

**Paragraph 4**

"[T]he facts contained in this affidavit show that there is probable cause to believe Steve Edward Warshak, Berkeley Premium Nutraceuticals, and other persons and corporate entities known and as yet unknown have been committing *and continue to commit* violations of the [mail and wire fraud statutes, money laundering statutes, and FDCA]"(emphasis added).

---

As earlier discussion demonstrates, even assuming *arguendo* that the affidavit facially established probable cause to believe that Warshak, BPN, or other Warshak companies committed mail/wire fraud, money laundering, or FDCA violations at some point in time (a proposition the defendants vehemently reject), the actual facts, of which Almaguer was well aware, would have precluded a finding of probable cause to believe that those violations continued beyond the fall of 2004, at the latest. As of December, 2004, billing problems in conjunction with the auto-ship program on which Almaguer placed great reliance as the foundation of his claim of probable cause to believe that Warshak and his companies were engaged in mail and wire fraud had been addressed, as of the fall of 2004 the FDA issues to which Almaguer refers had been corrected to the satisfaction of the FDA, *see* Affidavit of Benjamin L. England, Esq., attached hereto as Exhibit 12, at ¶11(C), and issues which had been raised by the FTC regarding product advertising and auto-ship disclosures had been resolved to the satisfaction of the FTC to the point that settlement discussions were well under way (a draft decree had been presented to BPN in or about September 2004). As noted, complaints to the BBB had dropped off significantly and were virtually absent by March 2005. The extensive efforts to correct any civil, regulatory issues were paying huge dividends. Almaguer's assertion that the affidavit would demonstrate that Warshak, BPN, and other Warshak companies "continue[d] to commit" the alleged offenses provides a telling indicator of his intent to omit

29

information inconsistent with that conclusion with the intent to mislead the Magistrate Judge into permitting seizures of records, documents, and other items up to the time of the search on March 16, 2005, rather than confining the search to the temporal parameters of the probable cause, if any, shown by the affidavit.

### ALMAGUER FAILED TO INFORM THE MAGISTRATE JUDGE OF VAST ELECTRONIC INFORMATION IN HIS POSSESSION.

As a result of subpoenas served in December 2004 and January 2005 pursuant to the Stored Communications Act, Verio Inc. produced on or about February 2, 2005 approximately 25,000 emails to Almaguer directly. Verio was the Internet Service Provider used by Berkeley. Likewise, as a result of a preservation request on October 24, 2004 and a subpoena in January 2005 pursuant to the Stored Communications Act, NuVox Communications produced approximately 11,000 emails directly to Almaguer on January 21, 2005. NuVox was the ISP used by Steven Warshak. On March 2, 2005, Almaguer obtained possession of approximately 55,000 thousand emails seized from computers used by James Teegarden (the computers had initially been seized on January 13, 2005 by the Boone County Sheriff's Department and Almaguer secured a Federal warrant on March 1, 2005 ordering that images of the computers be provided to him), including thousands from Warshak and other targets. As such, before seeking authorization for a warrant to seize virtually all of Berkeley's computers, Almaguer already possessed thousands of emails of three main targets of his investigation—Berkeley, Steven Warshak, and James Teegarden, as well as other targets, yet he never informed the Magistrate Judge of these material facts.

30

## ALMAGUER CONFLATED LEGAL TERMS AND GROSSLY GENERALIZED IMPORTANT CONCEPTS

---

### Paragraph 6

"The impetus for this investigation stems from numerous *mail fraud* complaints received by the United States Postal Inspection Service and the Cincinnati Better Business Bureau from consumers across the nation complaining that they have been *defrauded* by Warshak's companies" (emphasis added).

---

The elements of federal mail fraud are "(1) devising or intending to devise a scheme to defraud (or to perform specified fraudulent acts); (2) involving a use of the mails; . . . (3) for the purpose of executing the scheme or attempting to do so." *United States v. Frost*, 125 F.3d 346, 354 (6th Cir. 1997). *See, e.g., United States v. Turner*, 465 F.3d 667, 680 (6th Cir. 2006). "A defendant does not commit mail fraud unless he possesses the specific intent to deceive or defraud." *Frost*, 125 F.3d at 354. *See, e.g., United States v. Daniel*, 329 F.3d 480, 485 (6th Cir. 2003); *United States v. Goodpaster*, 769 F.2d 374, 377 (6th Cir. 1985). To constitute criminal mail or wire fraud, a scheme to defraud must involve "*intentional* fraud, consisting in deception *intentionally* practiced to induce another to part with property or to surrender some legal right, and which accomplishes the end designed." *Bender v. Southland Group*, 749 F.2d 1205, 1216 (6th Cir.1984), *quoting Epstein v. United States*, 174 F.2d 754, 765 (6th Cir.1949)(emphasis added by Court).

"Mail fraud" has, therefore, a specific meaning in federal law, and in utilizing that term Almaguer sought to imply that *all* the complaints to which he referred described conduct which met that definition – that each and every complaint set forth facts which, if true, demonstrated the *intentional* devising and *intentional* execution by Warshak and his companies of a scheme to defraud

31

their customers. This was, at a minimum, recklessly misleading, as was Almaguer's frequent conclusory use, throughout his affidavit, of terms such as "scheme," *see, e.g.,* Exhibit 2 at ¶10, 13, "scheme to defraud" or "fraudulent scheme," *see, e.g.*, Exhibit 2 at ¶14, 19, 22, 24, 30, 31, 36, and "fraud" or "fraudulent," *see, e.g.,* Exhibit 2 at ¶10, 15, 17, 20, 24. *See United States v. Alvarez*, 127 F.3d 372, 373-74 (5th Cir. 1997)(finding affiant acted in reckless disregard of the truth when he alleged that a video depicted minors engaged in "sexual conduct," without including a description of the video, where video merely showed an exposed breast); *United States v. Namer*, 680 F.2d 1088, 1094 (5th Cir. 1982)(finding statement in affidavit that offerings were "classified" as securities made with, at a minimum, reckless disregard for the truth because "classified" connotes the authoritative result of an established methodology, but statement was simply the oral opinion of a single agency employee); *see also United States v. McCain*, 271 F.Supp.2d 1187, 1196 (N.D.Cal. 2003)(submission of conclusions as facts makes a proper determination of probable cause impossible).

---

**Paragraph 17**

**"In my experience as a prosecutor and investigator of mail fraud, I know that the volume of consumer complaints against a particular business usually comprises a very small percentage of the actual victims of fraud."**

---

This paragraph repeats the same inaccurate and misleading implication that all consumer complaints are tantamount to federal mail or wire fraud which has been previously discussed. Moreover, Almaguer pretends in this paragraph to have expertise which he does not have. According

32

to his own statement in Paragraph 1 of the affidavit, Almaguer has *no* experience in prosecuting federal mail fraud – he prosecuted violations of the Ohio state consumer protection statute. Whatever conclusions it might be possible to draw from consumer complaints of state-law fraud, they do not necessarily generalize to apply to the narrower and restrictive definition of mail fraud under federal law, and Almaguer was at least reckless in not drawing the distinction.  This is in fact a form of recklessness which is found throughout the affidavit – repeated reference by Almaguer to "fraud" as if all forms of fraudulent consumer practices automatically constituted Federal mail or wire fraud.

## ALMAGUER MISREPRESENTS STANDARD BUSINESS PRACTICES AS SOMEHOW INDICATIVE OF CRIMINAL ACTIVITY.

| | |
|---|---|
| **Paragraph 8**: "Warshak's products are . . . packaged to appear remarkably similar to prescription drugs, so much so that each product has its own Latin/medical name." | **Paragraph 14**: "Warshak has since registered with Ohio's Secretary of State other various business names and uses those legal entities for the same or similar purposes to carry out his scheme to defraud." |

These statements are simply not true.  First, as Almaguer must have known or was reckless in failing to discover before making such a categorical characterization of the products, the appearance of *none* of the products was "remarkably similar" to that of a prescription drug. Instead, they were characterized by innovative design, attractive color schemes, and photographs, quite the antithesis of the generally bland packaging of prescription drugs.  *See* Exhibit 13 (visual displays of products).  The packaging of the products bears the words "Dietary Supplement" on the front panel,

33

and the Supplemental Fact Panel bears the disclosure that "[t]hese statements have not been evaluated by the [FDA]. [BPN] brands are not intended to diagnose, treat, cure, or prevent any disease." Dietary supplements are routinely packaged in blister packs. *See* Exhibit 12 (Affidavit of Benjamin L. England) at ¶11(B). Such packaging is not illegal and not evidence of a violation of the FDCA. *Id.*

Moreover, only *two* products, Avlimil and Enzyte, *ever* had a "Latin/medical" name, and those names were changed in early 2003, *two years* before the search warrant application. *See* Affidavit of Cheryl Walters attached hereto as Exhibit 14**.** The names of the products marketed by BPN and its predecessors before March, 2005, such as Avlimil, Enzyte, Rovicid, and Rogisen, were not Latin or medical. Finally, each of the companies to which Almaguer referred was a legitimate business established for legitimate business purposes.

### ALMAGUER RELIED ON OLD, ISOLATED ADVERTISEMENTS TO MISREPRESENT THE NATURE OF BERKELEY'S ADVERTISING, AS WELL AS MINIMIZED ITS OPERATIONS.

<div style="border:1px solid black; padding:8px;">

#### Paragraph 30

As part of his scheme to defraud, Steve Warshak and his companies often employ false, misleading, and unsubstantiated claims. According to internal BPN documents and interviews with current and former employees, Steve Warshak describes himself as having a 'knack for marketing' and is personally involved in product creation and marketing. In advertising literature used in 2001, Warshak marketed Enzyte in Men's Health Magazine as a male enhancement supplement, "stating 'your erectile chambers, as well as your penis, will enlarge up to 41%.' The advertisement has multiple other misrepresentations, including fake doctor names, 'results guaranteed', '98.3 Success Rate.' For example, this Men's Health Magazine advertisement stated that 'Dr. Michael Moore, a leading urologist from Harvard' developed Enzyte. However, I called Harvard University and confirmed that no Michael Moore was on the faculty at Harvard … In recent years, Warshak has altered the size claims with various qualifiers in printed material."

</div>

In the introductory sentence to this paragraph Almaguer states, in the present tense, that

34

"Warshak and his companies often employ false, misleading, and unsubstantiated claims." However, the sole example of false or misleading claims that the affidavit sets forth pertains to a 2001 advertisement, three to four years before the search warrant affidavit, that ran a dozen or so times, which is dwarfed by the hundreds of other Berkeley advertisements that ran more millions of times in the ensuing years. Almaguer did go on to say that "[i]n recent years, Warshak has altered the size claims with various qualifiers in printed material." This suggests that, although the size claims had been qualified, the remaining statements regarding guaranteed success, increasing the size of the penis itself, and the identity of the developer of Enzyte remained unchanged. This was untrue, and Almaguer knew it. Beginning in 2002, Enzyte did not promise an increase in the natural size or shape of the penis, *see* Exhibit 14 (Affidavit of Cheryl Walters) at ¶4, and the statement about Dr. Moore was discontinued in 2001.  *See* Exhibit 6 (June 2004 Enzyte website snapshot specifically noting, amongst other things, that Enzyte can not alter natural physical size).

---

**Paragraph 31**

**"Another way that Warshak's companies have carried out the scheme to defraud is by requiring sales representatives to use sales scripts that contain various misrepresentations. Recently, in 2004 Warshak's companies removed size change claims for their printed material for Enzyte; however, Warshak's companies continue to require sales representatives to use sales scripts representing to customers that Enzyte could increase the size of their penises. In November, 2004, Warshak's companies re-introduced sales scripts, requiring Sales Representatives to tell customers that "enzyte has been 91% successful (after 3 months) with most men reporting an increase in size and fullness of their erection 12-31% with the average being 24%."**

---

This paragraph continues Almaguer's effort to portray BPN as an illegitimate company

35

duping the gullible into buying useless products with fraudulent claims regarding their efficacy. In fact, as the script quoted – but mischaracterized – by Almaguer demonstrates, sales representatives were not telling customers in November, 2004, that Enzyte would increase the size of their *penises*. Instead, the scripts and other literature made the very different claim that Enzyte may help achieve fuller and/or firmer *erections*.  *See* Exhibit 6.  Earlier and later brochures and marketing materials make this distinction.

The truth about post-2001 Enzyte marketing was critical to the Magistrate Judge's ability to evaluate Almaguer's claims that BPN and other Warshak companies were making fraudulent claims to consumers regarding the efficacy of their products, especially in light of the virtually unlimited authority Almaguer sought to seize advertising and marketing materials, product scripts, product development information, and even products themselves, as listed in his Attachment B.

---

**Paragraph 28**

**"The Sales Department . . . is primarily an in-bound call center staffed by dozens of telephone operators who are given scripts to follow for telephone calls."**

---

In fact, in January, 2004, the Sales Department had 30 sales managers, 446 hourly employees, and 8 trainees; in June, 2004, it had 40 sales managers, 382 hourly employees, and 8 trainees; in March, 2005, it had 28 sales managers, 614 hourly employees, and 15 trainees, information very much at odds with Almaguer's intentionally distorted description of the Sales Department.  *See* Affidavit of Bonny Luther, attached as Exhibit 10, at ¶4. Given Almaguer's knowledge of, or access to, this information, Almaguer acted, at the very minimum, in reckless disregard of the truth in

36

describing the Sales Department as he did.

## ALMAGUER MISREPRESENTED BERKELEY'S RELATIONSHIP WITH MERCHANT PROCESSORS AND CREDIT CARD INDUSTRY.

In numerous paragraphs, Almaguer at the very least recklessly relied upon information relating to the processing of credit cards to support his assertions that Warshak's companies were engaged in a scheme to defraud in violation of the Federal mail and wire fraud statutes, including but not limited to erroneously asserting that as a result of a scheme to defraud Warshak's companies experienced an abnormally high chargeback rate (Paragraph 19), that Warshak and his companies had multiple merchant accounts to avoid detection by VISA (Paragraph 19), that high chargeback totals from VISA supposedly demonstrated that the scheme to defraud perpetrated by Warshak's companies far exceeded the complaint volume received by the Cincinnati BBB (Paragraph 22), and that Berkeley would attempt consecutive charges to credit cards that had been declined (Paragraph 37). Obviously, violations of the credit card industry's policies are not the equivalent of a Federal mail or wire fraud offense, yet that is the message he at minimum recklessly conveyed to the Magistrate Judge, *see* Paragraphs 37-39, 42.

First, BPN and other Warshak companies did not experience "abnormally high" chargeback rates, as asserted in Paragraph 19. The credit card industry has imposed an arbitrary chargeback ratio of 1% or less, it used to be higher, internationally it is 2%, exceeding the ratio does not typically cause any action unless it become a pattern which then often causes the company to be placed in various chargeback monitoring programs (for up to 14 months to correct the problems), and it was entirely misleading to suggest that exceeding an arbitrary 1% ratio was "abnormally high" or that the chargebacks were the product of a "scheme to defraud. *See, e.g.*, Exhibit 11 (Wheeler Affidavit) at

37

¶¶11-13. Of course, not all chargebacks are the result of fraud—customers can initiate a chargeback for many reasons and customers often forget details regarding their purchasing experience. *See* Exhibit 11 (Wheeler Affidavit) at ¶13. In any event, since at least October 2004, the companies have always been below the arbitrary 1% ratio.

Second, it is misleading to imply that multiple merchant accounts with multiple banks and a large number of cancelled accounts are indicative of a criminal scheme to defraud. As Almaguer knew, however, or should have found out before suggesting an inference of criminal conduct, it is not at all uncommon for legitimate merchants to have multiple VISA merchant accounts. *See* Exhibit 11 (Wheeler Affidavit) at ¶¶8-10. Nor is it indicative of fraud that a merchant has a high number of cancelled accounts. *Id*. Accounts may be cancelled for many reasons – for example, the acquiring bank may go out of business or the Merchant might find better terms or increased levels of service. *Id*.

Third, Warshak's companies did not utilize different names on merchant accounts "to avoid detection by VISA." Merchants can utilize different names for different accounts for a number of different reasons – new products for which separate accounts were opened, a change in merchant processors, requests from merchant processors that separate accounts be opened, the creation of separate accounts for continuity sales (what Almaguer refers to as "auto-ship") and non-continuity sales. *See* Exhibit 11 (Wheeler Affidavit) at ¶9. Many companies used different merchant names to assist the customer to identify the transaction. For example, Time Inc. might have a merchant account named Sports Illustrated (rather than Time) so their customers better recognize the transaction when they receive their credit card bill. Exhibit 11 (Wheeler Affidavit) at ¶9.

Fourth, the decline recovery practices discussed by Almaguer (*e.g.*, Paragraph 37) are

38

common in the industry and not indicative of a Federal mail or wire fraud.  Clearly, resubmitting a declined card *after a customer has approved and authorized the transaction*, does not amount to a mail or wire offense, as Almaguer misleadingly conveys.  *See* Exhibit 2 at ¶38 (asserting that these practices are contrary to VISA credit card merchant rules, which require the credit card holders to be contacted and a re-authorization obtained, and that the practice resulted in thousands of unauthorized credit card charges to consumers across the country.).  Likewise, even if one assumed *arguendo* that splitting transactions to manage chargeback ratios was not permitted by VISA or other credit cards, *see* Exhibit 2 at ¶42 (asserting that Berkeley split sales to manage chargeback ratios), it certainly does not amount to mail fraud or wire fraud—in such a scenario, the customer is billed precisely the amount he or she has authorized.

In summary, Almaguer's reliance on the rules and/or regulations of the credit card industry was at the very least recklessly misleading.  Clearly, violations of VISA's, MasterCard's or any other credit card's merchant rules does not constitute a Federal mail or wire fraud.

**ALMAGUER MISREPRESENTED NATURE OF FINANCIAL TRANSACTIONS.**

In paragraphs 48 through 52, Almaguer falsely represents to the Magistrate Judge that every penny which was deposited into the operating accounts of Warshak's companies as the result of consumer credit card transactions or which was transferred out of those accounts represented the "proceeds" of "specified unlawful activity."   For all of the reasons discussed *supra*, that simply is not true.  Moreover, there was no concealment.  The funds were transferred to and from business accounts, set up in business names, for legitimate and necessary business reasons, and/or to and from accounts bearing the name Warshak.  Almaguer's conclusory assertions to the Magistrate Judge regarding the money laundering allegations were simply false, misleading and/or reckless.

39

## ALMAGUER MISREPRESENTED FDA INQUIRY.

> ### Paragraph 58
>
> "On October 14, 2004, the U.S. Food and Drug Administration issued Warning Letter 05-22249, to Steve Warshak, President, [BPN], informing Warshak that BPN . . . is in violation of the Federal Food, Drug, and Cosmetic Act, 21 U.S.C. §301, et seq. (the Act) for misbranding certain products and making claims causing certain of its products to be classified as drugs under the Act (see http:www.fda/gov/foi/warning_letters/g5013d.htm). The Warning Letter calls for BPN to correct the items described in the letter. *However*, interviews of current employees and internal documents reveal that Warshak's companies *continued* to violate the Act into November 2004 by requiring sales representatives to state to consumers that Enzyte could cause an increase in the size of their penises, in violation of 21 U.S.C. Sec. 321(g)(1)(C) (emphasis added)."

Based upon these representations, Almaguer sought virtually unlimited authority to seize sample products and product-related documents and other items. *See* Exhibit 2 at Attachment B. This paragraph is, however, manifestly false and misleading both because of what it says and what it omits. It falsely implies that the FDA warning letter contained a warning about Enzyte advertising claims that BPN ignored at least through November, 2004, *i.e.*, it "continued" the violation despite the warning.  In fact, the only mention of Enzyte in the warning letter had to do with discrepancies between advertised and actual dosage weights, *not* claims regarding penis size, *see* Letter from FDA, attached hereto as Exhibit 15, which is something Almaguer clearly knew given his familiarity with the letter.  In addition, Almaguer's assertion that BPN sales representatives were required in November, 2004, to claim that Enzyte would increase penis size was made in reckless disregard for the truth, as Almaguer also well knew or should have known, given his familiarity with the script in question and what it actually said.  Finally, Almaguer's statement that the Enzyte claims violated

40

21 U.S.C. §321(g)(1)(C) was recklessly false; that section is merely a definition provision. *See* Exhibit 12 at ¶11(C).

Additionally, Almaguer failed to inform the Magistrate Judge that the FDA received an adequate response to the warning letter. *See* BPN and FDA responsive letters attached hereto as Exhibit 16; Exhibit 12 (England Affidavit) at ¶11(C). That is, reliance on a warning letter without disclosing the response from the business, and the follow up response from the FDA, was a misrepresentation by Almaguer by leaving the impression that BPN was in violation of the FDCA, when they in fact were not in such violation. *See* Exhibit 12 at ¶11(C).

### C. Conclusion.

With the false and misleading information that was included, at minimum, with a reckless disregard for the truth deleted, and the information recklessly or intentionally omitted to mislead the magistrate judge, the affidavit fails to establish probable cause to believe that Warshak, BPN, or any other Warshak company had committed or was committing Federal mail or wire fraud, money laundering or FDCA violations. Because the defendants have made "a substantial preliminary showing that specified portions of the affiant's averments are deliberately or recklessly false" and that "a finding of probable cause would not be supported by the remaining content of the affidavit when the allegedly false material is set to aside," the defendants are entitled to a *Franks* hearing. *See Frazier*, 423 F.3d at 538; *Stewart*, 306 F.3d at 304 (if the Court's assessment is that probable cause would not exist if the false statements are excluded from the determination, then the Court "must hold a full evidentiary hearing to determine whether the affidavit was properly submitted.").

WHEREFORE, the defendants respectfully request that the Court convene an evidentiary hearing pursuant to *Franks v. Delaware*, 438 U.S. 154 (1978), and thereafter suppress all evidence seized by the government from the premises of Berkeley (and all derivative fruits thereof).

41