UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | Criminal No. CR-1-06-111 |
| | : | |
| | : | Senior Judge S. Arthur Spiegel |
| vs. | : | |
| | : | **RESPONSE OF THE UNITED STATES** |
| | : | **TO DEFENDANTS' OMNIBUS** |
| STEVE WARSHAK, et al | : | **PRETRIAL MOTIONS** |

The United States responds herewith in opposition to the Omnibus Pretrial Motions (hereinafter "Omnibus Motion") filed by the collective defendants. For the reasons set forth herein, the United States asserts that no portion of the Omnibus Motion has merit, and this Court should deny it in its entirety.

The Omnibus Motion – nearly 300 pages in length, not including the attachments – argues seventeen points, as follows, that: (1) this Court must permit an evidentiary hearing to permit the defense to challenge the sufficiency of the search warrant affidavit (a "Franks" hearing); (2) all of the information/evidence obtained from internet service providers must be suppressed because of statutory violations; (3) this Court must suppress all evidence obtained or derived from Berkeley's three locations because of the "outrageous" manner in which the search warrants were executed; (4) this Court must suppress all evidence obtained or derived from Berkeley's three locations because of "facial defects" in the warrants and affidavit; (5) this Court must suppress all evidence obtained from so-called "BPN" laptops because Berkeley claims a privacy interest therein; (6) this Court must suppress all evidence obtained from a so-called "BPN" laptop recovered by Kentucky state law enforcement authorities because Berkeley claims

a privacy interest therein and because the defense attacks the sufficiency of the Kentucky state authorities' search warrant; (7) this Court must either dismiss the indictment completely or suppress all the evidence because the defense claims that the government "improperly exploited parallel civil proceedings"; (8) this Court must conduct a hearing with regard to the Food and Drug Administration's "internal agency documents" and must suppress any evidence obtained as a consequence of the Food and Drug Administration's investigation inasmuch as the defense argues that said investigation was an "intentional and egregious deception" and a "covert criminal investigation"; (9) this Court must dismiss the indictment because the defense claims a breach of the "join (sic) defense, common interest and corporate attorney-client privileges"; (10) this Court must dismiss the indictment because the defense claims a breach of Federal Rule of Criminal Procedure 6(e); (11) this Court must dismiss the indictment because the defense claims the government is generally "outrageous"; (12) this Court must dismiss Count 111 of the indictment because the defense claims it fails to plead an element of the offense and the FDA inspection was a "pretext"; (13) this Court must dismiss Counts 15, 23 and 27 of the indictment because the defense claims that the government "fails to allege facts sufficient"; (14) this Court must dismiss Count 108 of the indictment because the defense claims that it is "duplicitous" and violates defendant Steven Warshak's "Fifth Amendment right to be free from double jeopardy"; (15) this Court must dismiss either Count 30 or 31 of the indictment because the defense claims they are "multiplicitous"; (16) this Court must unseal and disclose to the defense all ex parte submissions; and (17) this Court must refuse to allow the government to use the audio recording and transcript because the defense argues they are "not trustworthy...not material" and their probative value "is substantially outweighed by its prejudicial effect".

The defendants' arguments are addressed in order, beginning with their demand for a
Franks hearing.

## I.   THE DEFENDANTS HAVE NOT OVERCOME THE PRESUMPTIVE VALIDITY OF THE SEARCH WARRANT AFFIDAVIT AND THERE SHOULD BE NO ADDITIONAL HEARING BASED ON FRANKS V. DELAWARE.

These defendants' demand for a Franks hearing is not well-taken, first because the search
warrant affidavit does not contain the deficiencies they allege, and second because the
defendants' submissions do not in any way amount to the "substantial" or "strong" showing
required to surmount the presumptive validity of the Magistrate Judge's assessment of the
affidavit and warrant request.  The defendants attack several paragraphs of the affidavit – these
are addressed below, however, the government asserts that defense arguments claiming that
Postal Inspector Almaguer supposedly "misrepresented" or "omitted" critical and material
information are themselves misrepresentation of both the facts and the law.

Franks v. Delaware, 438 U.S. 154, 98 S.Ct. 2674 (1978) recognized a defendant's right to
challenge the sufficiency of an executed search warrant on the basis that " a false statement
knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant
in the warrant affidavit, and ... the allegedly false statement is necessary to the finding of
probable cause[.]"  438 U.S. at 155-56, 98 S.Ct. at 2676.  However, under Franks the defendant
is entitled to an evidentiary hearing on the veracity of the statements in the affidavit if and only if
(1) there is a substantial preliminary showing that specified portions of the affiant's averments are
deliberately or recklessly false *and* (2) a finding of probable cause would not be supported by the
remaining content of the affidavit when the allegedly false material is set to one side.  United
States v. Atkin, 107 F.3d 1213, 1216-1217 (6th Cir. 1997), *citing* Franks, and United States v.

Campbell, 878 F.2d 170, 171 (6th Cir.) *(emphasis in original)*, *cert.denied*, 493 U.S. 894, 110 S.Ct. 243 (1989).

In the Atkin case, Atkin did not contend that the affidavits contained materially false affirmative statements, but rather that they omitted information crucial to evaluating the credibility of certain individuals who provided information to the government. The Sixth Circuit held that while material omissions are not immune from inquiry under Franks, an affidavit which merely omits *potentially exculpatory information* is less likely to present a question of impermissible official conduct than one which affirmatively includes false information. Atkin, 107 F.3d at 1217. *See also*, United States v. Martin, 920 F.2d 393, 398 (6th Cir.1990). This is so because the allegation of omission "'potentially opens officers to endless conjecture about investigative leads, fragments of information, or other matter that might, if included, have redounded to defendant's benefit. The potential for endless rounds of Franks hearings to contest factually sufficient affidavits is readily apparent.'" United States v. Martin, 920 F.2d 393, 398 (6th Cir.1990)(*quoting* United States v. Colkley, 899 F.2d 297, 301 (4th Cir.1990)).

The Sixth Circuit revisited the potential application of Franks to situations involving alleged omissions from a search warrant application in the case Mays v. Dayton, 134 F.3d 809 (6th Cir. 1998), *rehearing en banc denied* (1998). In Mays, the Sixth Circuit wrote that, "...except in the *very* rare case where the defendant makes a strong preliminary showing that the affiant with an intention to mislead excluded critical information from the affidavit, and the omission is critical to the finding of probable cause, Franks is inapplicable to the omission of disputed facts"Id., at 816 (emphasis in original), reasoning that "the probable cause determination in Franks, derived from the Fourth Amendment, involves no definitive adjudication of innocence or

4

guilt and has no due process implications. Because the consequences of arrest or search are less severe and easier to remedy than the consequences of an adverse criminal verdict, a duty to disclose potentially exculpatory information appropriate in the setting of a trial to protect the due process rights of the accused is less compelling in the context of an application for a warrant." Id.

      The Sixth Circuit also emphasized some of the basic tenets of search warrant law in the Mays case, reflecting that "the obligations shouldered during the adjudication process should not be imposed by inference onto the warrant application process." Mays, 134 F.3d at 816. Some of these are worth stating in the context of this case. First:

> "When reviewing an application, courts must bear in mind that search warrants are directed, not at persons, but at property where there is probable cause to believe that instrumentalities or evidence of crime will be found. Zurcher v. Stanford Daily, 436 U.S. 547, 98 S.Ct. 1970 (1978). The affidavit in support of the warrant need not present information that would justify the arrest of the individual in possession of or in control of the property. Id. The owner of the property to be searched need not be suspected of having committed a crime. Id. Property owned by a person absolutely innocent of any wrongdoing may nevertheless be searched under a valid warrant. Id."

Mays, 134 F.3d at 814.

      Another:

> "A determination of probable cause simply requires consideration of whether there were reasonable grounds to believe at the time of the affidavit that the law was being violated on the premises to be searched. U.S. v. Eisner, 297 F.2d 595, 596 (6th Cir.), cert. denied, 369 U.S. 859, 82 S.Ct. 947 (1962); see also U.S. v. Loggins, 777 F.2d 336, 338 (6th Cir.1985) (probable cause exists when there is a fair probability, given the totality of the circumstances that contraband or evidence of a crime will be found in a particular place)."

Mays, Id.

And another:

> "In determining whether a warrant is supported by probable cause, this Court pays 'great deference' to the issuing magistrate's determination as to probable cause and recognizes that such a finding should not be set aside unless arbitrarily exercised. U.S. v. Goff, 6 F.3d 363, 366 (6th Cir.1993); *see also* Illinois v. Gates, 462 U.S. 213, 103 S.Ct. 2317 (1983) (determination by the issuing magistrate judge will be upheld so long as the magistrate judge had a substantial basis for concluding that a search would uncover evidence of wrongdoing)."

Mays, Id.

The Omnibus Motion goes to great lengths to attack the averments in the search warrant affidavit accepted by Magistrate Judge Hogan. In so doing it resorts to a number of non-evidentiary arguments, posited against the facts known to investigating officers. The facts as known to the investigators are what matter. It is not sufficient for these defendants to broadly allege that the affidavit contains facts that could not be true based on Steven Warshak's/their collective knowledge. U.S. v. Rodriguez-Suazo, 346 F.3d 637 (6th Cir. 2003).

The best evidence of sufficiency of the Magistrate Judge-approved search warrant affidavit is, of course, the affidavit itself. This one is twenty-two (22) pages long, and contains sixty-five (65) separate paragraphs. The defendants assail approximately thirty (30) paragraphs. The United States addresses – and refutes – each of the defendants' arguments with respect to these paragraphs more or less in the order that they appear in the Omnibus Motion.

The defendants argue (Doc. 171-2, p. 22 of 51) that paragraph 21 of the affidavit, which deals with the thirty-seven thousand, eight hundred fifty five (37,855) "chargebacks" totaling two million, eighty thousand, six hundred sixty six dollars ($2,080,666) over a seventeen month period (January 2003 to June 2004) is "highly misleading" and "reckless". Importantly, they do NOT contest the accuracy of the numbers or calculations contained in that paragraph. Their

6

argument appears to be that, since Berkeley companies did a high volume of sales, such facts do not matter. The United States respectfully disagrees. The affidavit in its entirety reveals the numerosity of the fraud indicators present in defendant Steven Warshak's practices, which comports with the standard for issuing a search warrant for evidence.[1] Direct evidence of actual criminal conduct is not necessary. U.S. v. Malin, 908 F.2d 163, 165 (7th Cir. 1990). Certainly, the defense cannot claim that high numbers of chargebacks somehow contradicts or negates fraud. Further, while defendants would have this Court believe that such practices are normal, and that defendant Steven Warshak "voluntarily" altered Berkeley's practices to remediate the situation, the truth is that VISA forced Berkeley to alter its practices. Numerous communications – from Warshak himself and from VISA reveal this, belying the defense's representation. (See Exhibits 1, 2, 3, 4, 5 and 6 to this response). The defendants also tie their arguments against paragraph 21 to those they make against paragraph 15, citing with some triumph a decline in complaints registered against Berkeley via the Better Business Bureau (Doc. 171-2, p. 37 of 51). Neither do defendants dispute the numbers Inspector Almaguer relates in this paragraph. And as described above, inasmuch as the "decline" period cited by the defendants is the same period during which VISA forced Berkeley to alter [its scheme to defraud], their claimed "fix" appears rather misleading. Logically, during a time when Berkeley's then-credit card processor required Berkeley to cease and desist the sort of conduct as ultimately resulted in the indictment, BBB

---

[1] A determination of probable cause simply requires consideration of whether there were reasonable grounds to believe at the time of the affidavit that the law was being violated on the premises to be searched. U.S. v. Eisner, 297 F.2d 595, 596 (6th Cir.), *cert. denied*, 369 U.S. 859, 82 S.Ct. 947 (1962); *see also* U.S. v. Loggins, 777 F.2d 336, 338 (6th Cir.1985) (probable cause exists when there is a fair probability, given the totality of the circumstances that contraband or evidence of a crime will be found in a particular place).

complaints would be likely to decline. This is hardly evidence of Berkeley's innocence, or of any other defendant's innocence. In fact, Warshak and Berkeley soon thereafter began to utilize a different credit card processor.

Defendants similarly argue in paragraph 18 that the high volume of mail returned to Berkeley is a misleading statistic (Doc. 171-2, p. 17 of 51) . First, as with paragraphs 15 and 21, the defendants do not dispute the numbers attested to by Inspector Almaguer (89,000 pieces or returned mail, or 17,000 pieces per month during the analyzed period). This information is completely accurate. The defendants' tactic here is to impugn the number by claiming disingenuously that "consumers return products for many reasons..." as if that adequately explains 89,000 pieces of returned mail over five months. The defendants well know that investigations such as this one often present a number of fraud indicators, which when aggregated might well – and in this case, did – lead a neutral and detached magistrate to agree that a search of certain premises for evidence is appropriate. Further, interviews with witnesses revealed to agents that Berkeley's "auto-ship" scheme was the primary impetus for the returns.

Defendants also claim in their Omnibus Motion that paragraph 9, which they summarize rather than restating verbatim, is somehow misleading because Inspector Almaguer avers that he interviewed "several" consumers who complained about Berkeley using the "auto-ship" program to bill their credit cards without authorization (Doc. 171-2, p. 28 of 51). Again, this attestation is not disputed by the defendants. Instead, they seek to try and minimize its value by arguing that Berkeley had a rapid growth rate, as if committing only a small amount of credit card fraud is somehow completely excusable and could not possibly form any part of the basis to further investigate (e.g., by search warrant). They cite this Court to the case, <u>United States v. 1328 N.</u>

8

Main Street, 713 F. Supp. 1495, 1510 (S.D. Ohio 1988), as authority. Again, the United States respectfully disagrees. Fraud is fraud. Billing people's credit cards without authorization, added to massive product returns (for those who refused to be scammed) and a high volume of credit card chargebacks and Better Business Bureau complaints does, in the government's view, justify further inquiry by reasonable investigative methods (e.g., by search warrant). As to their cited authority, the defendants concede that the 1328 Main Street case involved the an assessment of a number of pills that might have theoretically and legitimately been prescribed, rather than an assessment of how many people were theoretically defrauded. That case is therefore inapposite to the one at bar.

Defendants also claim that paragraph 11 of Inspector Almaguer's affidavit is "simply false" (Doc. 171-2, pp. 29-30 of 51). This bald contention appears to be principally founded on the defendants' representation that "continuity inserts" (purporting to describe the involuntary enrollment process for the "auto-ship" practice and thus, place the consumer "on notice") were included at some point with the shipped product. First, Inspector Almaguer's attestation is based on his investigation, including witness interviews (some of former Berkeley employees), which is perfectly acceptable. Second, claiming that post-sale "continuity inserts" provided adequate or suitable disclosure of the impact of Berkeley's auto-ship scheme is amazing and strains credulity. Third, the defense admission that some 800,000 people cancelled auto-ship prior to the first shipment might well give rise to the inference that 800,000 people were able to prevent being defrauded. Again, such fact is not logically associated with a lack of culpability by Berkeley or the other defendants.

9

Defendants complain that paragraph 16 of the affidavit is "highly misleading" (Doc. 171-2, p. 31 of 51) yet they do not dispute the facts asserted within it. It, like the other averments in the affidavit, is a true statement based on witness interviews. The defendants thinly seek to associate themselves with legitimate businesses while again disingenuously implying that Warshak and his companies "voluntarily" made remedial changes in the auto-ship program when in truth any and all "changes" were only temporary in nature and were designed to facilitate the fraud scheme.

Defendants cite paragraphs 29 and 42 of the affidavit as alleging mere "systematic failures" (Doc 171-2, pp. 32-33 of 51), but that also is inaccurate. The truth is that Berkeley employees informed Inspector Almaguer that they were actually instructed not to tell callers about the automatic enrollment into auto-ship. That is not really a "systematic failure". That is fraud. And again, importantly, the defendants do not actually dispute the facts asserted in these paragraphs – they simply seek to recast them.

The defendants complain that paragraphs 10 and 32 of the affidavit are "gross misrepresentations" of Berkeley's "refund practices" (Doc. 171-2, pp. 33-36 of 51). Again, these facts are not really contested – the defendants characterize them as "save the sale strategies" – and the fact that they admit being forced to issue "millions" in refunds, in the context of the involuntary enrollment into auto-ship, does little to actually contraindicate fraud. Like all of their putative findings regarding the affidavit and Magistrate Judge Hogan's determination, it is all just so much spin. They simply give clever and businesslike names for the fraud scheme. And, claiming entitlement to a <u>Franks</u> hearing on the back of such protestations is rather like a street-level drug dealer demanding a <u>Franks</u> hearing by simply filing an affidavit that declares the contrary of what a search warrant attests to, e.g., "there was no cocaine in the trunk of my car".

Further spinning, the defendants argue that paragraphs 33, 34 and 35 of the affidavit as mischaracterizing Berkeley's "short term, transient orders regarding refunds". They also euphemistically refer to this part of the fraud scheme as "cash flow management". (Doc 171-2, pp. 36-37 of 51) Again, they do not dispute that they did it – they just try to minimize it. Minimizing the fact that Warshak *et al.*, knowingly, intentionally and illegally took - and kept - people's money does not make it right. At the very least, it does nothing to lead any investigator – or the neutral and detached Magistrate Judge – to conclude that no further reasonable investigation is warranted.

The defendants argue that paragraph 4 of the affidavit is misleading (Doc 171-2, pp. 39-40 of 51). They declare falsely that the Food and Drug Administration and the Federal Trade Commission were "satisfied" with Berkeley and imply that there was something sinister going on because Inspector Almaguer "failed to inform" the Magistrate Judge that he had "vast electronic information in his possession". In truth, the FTC subsequently sued Berkeley, and the "electronic evidence" implication is at least puzzling, since the defendants do not appear to state that anything in the "electronic evidence" would contraindicate fraud or the need for a search warrant of the premises.

The defendants claim that paragraph 6 of the affidavit is a "conflation of legal terms" and a "gross generalization of important concepts" (Doc. 171-2, pp. 41-42 of 51). Citing to the elements of mail fraud, the defendants appear to argue that because Inspector Alamaguer did not talk to each and every person whose money was taken by Warshak *et al.*, there can be no fraud. The government's response to the defendants' complaint about paragraph 6 is that it contains true statements – the United States Postal Inspection Service and the Better Business Bureau did

11

receive "numerous mail fraud complaints from consumers across the nation complaining that they have been defrauded by Warshak's companies." Moreover, the government notes that the defendants do not include in their recitation of paragraph 6's contents it's last sentence, to-wit: "Specifically, consumers reported to the U.S. Postal Inspection Service that their credit cards were charged without their authorization"(perhaps their omission of this sentence in their brief concedes the veracity of the statement).

The defendants argue that paragraph 17 of the affidavit is "inaccurate and misleading" because it "implies" that "all consumer complaints are tantamount to...fraud" (Doc 171-2, pp. 42-43 of 51). Again, the government asserts that the best response to this claim is a reading of paragraph 17, which relates: "In my experience as a prosecutor and investigator of mail fraud, I know that the volume of consumer complaints against a particular business usually comprises a very small percentage of the actual victims of fraud." Again, the defendants do not dispute the very assertions made in this, and other paragraphs. Rather they seek to extrapolate selected sentences or words, second-guessing or divining what the Magistrate Judge "must have thought" when he approved the search warrants. The United States submits that the Magistrate Judge's determination was proper and that the deference accorded to that decision as a matter of law is not lightly awarded. U.S. v. Goff, 6 F.3d 363, 366 (6th Cir.1993); *see also* Illinois v. Gates, 462 U.S. 213, 103 S.Ct. 2317 (1983).

The defendants claim that paragraphs 8 and 14 of the affidavit are "simply not true" (Doc 171-2, pp. 43-44 of 51), and that their product names did not appear remarkably similar to prescription drugs. In fact there is very little meaningful difference between the manner in which Warshak's companies packaged and marketed his products and the manner in which prescription drugs are packaged and marketed. In fact, Warshak's ads give his products medical-sounding

12

and Latin names, and some have made a specific comparison between Avlimil and Viagra, as if they are comparable prescription drugs. (See Exhibits 7, 8 and 9 to this response). And paragraph 14, which contains five true sentences – to only one of which the defendants object. The five sentences are: (1) "Warshak began selling neutraceuticals in or about 2001 under the business name of Lifekey, Inc."; (2) In September 2001, the Cincinnati Better Business Bureau (BBB) received the first complaints on Warshak's companies"; (3) On September 2, 2001, Lifekey had three (3) complaints that were 'Unsatisfactory'"; (4) One was resolved; two were closed with no response from the customer"; and (5) Warshak has since registered with Ohio's Secretary of State other various business names and uses those legal entities for the same or similar purposes to carry out his scheme to defraud." None of the sentences – including the one to which the defendants object (the last one) – is inaccurate. In fact, among the "other companies" is Warshak's TCI Media, Inc. which had a criminal conviction. And the fact that Inspector Almaguer included the first four sentences suggests his interest in objectivity and candor with the Magistrate Judge. The United States disagrees with the defendants – paragraphs 8 and 14 are true.

While defendants complain about paragraph 30 of the affidavit is "untrue" (Doc 171-2, pp. 44-45 of 51), their protestations are based on their interpretation of the language in the paragraph regarding the use of the dates. In fact, they do not dispute the assertions in that paragraph which regard Berkeley's extensive history of using false, deceptive and misleading advertising practices in furtherance of their fraud scheme. The affidavit clearly adds – to the defendant's benefit – the qualifier regarding Warshak's alteration of some of these practices in recent times. And, as far as the dates are concerned, Inspector Almaguer's affidavit is consistent with the dates the United States alleges in the fraud scheme.

13

Defendants complain that paragraph 31 of the affidavit is also "misleading" although almost paradoxically they do not contest its accuracy (Doc. 171-2, pp. 45-46 of 51). The Omnibus Motion relates that "...sales representatives were not telling customers in November, 2004, that Enzyte[2] would increase the size of their *penises*. Instead, the scripts and other literature made the very different claim that Enzyte may help achieve fuller and/or firmer *erections*." (Emphasis in original.) A reading of paragraph 31 – which defendants only partially include – in fact says exactly that – specifically, the last sentence of that paragraph relates that, "In November 2004, Warshak's companies re-introduced sales scripts, requiring Sales Representatives to tell customers that 'Enzyte has been 91% successful (after 3 months) with most men reporting an increase in size and fullness of their erection 12-31% with the average being 24%.'" So the defendants' complaint about paragraph 31, citing to language that actually explains what they claim is not explained – is puzzling.

Paragraph 28 of the affidavit relates simply that "The Sales Department ('Sales') is primarily an in-bound call center staffed by dozens of telephone operators who are given scripts to follow for telephone calls." Defendants do not really dispute the accuracy of this statement, which appears as the first paragraph in a group of paragraphs under the heading "Sales Department", but merely add that there are or were other people in that department (Doc 171-2, pp. 46-47 of 51). Even were the Court to deem this paragraph so objectionable as to justify exclusion, doing so would not be in any way material. Nonetheless, as noted above the United States submits that it is an accurate statement and is in no way critically misleading.

---

[2] The government respectfully notes the Latin/medical sound of the name "Enzyte". See Exhibit 8.

Defendants allege that paragraph 19, 22 and 37 of the affidavit "misrepresented Berkeley's relationship with merchant processors and credit card industry" (Doc 171-2, pp. 47-49 of 51). These paragraphs' attestations are based on witness interviews, to include credit card industry representatives. The United States therefor respectfully disagrees with the defendants' claim that high chargeback ratios, multiple merchant accounts, attempted consecutive charges to already- declined customer credit cards are merely "violations of the credit card industry's policies". For example, in paragraph 20 – two paragraphs prior to the one the defendants claim is "misleading" and also not challenged by the defendants – there is contained this sentence: "The VISA fraud team monitors merchants for high chargeback activity, which can be an indicator that the merchant is involved in fraudulent activity." As with so many of the arguments the defense makes in their Omnibus Motion, they use a piecemeal attack to try and diffuse the Court's analysis onto single sentences and parts of paragraphs, clearly hoping to avoid a cumulative, cohesive reading of the affidavit or even of whole paragraphs. The truth is that the existence of each of these things in the subject paragraphs did in fact and effect facilitate the fraud scheme. The affidavit is twenty-two (22) pages long, and contains sixty-five (65) separate paragraphs and the government contends that the Magistrate Judge read it all and understood it all before authorizing the warrants.

The defendants complain that paragraphs 48 through 52 of the affidavit "misrepresented [the] nature of financial transactions" (Doc 171-2, p. 49 of 51), although they offer nothing other than a bare denial of the indictment as support for their position. The United States disagrees with their position – the indictment speaks for itself and is as a matter of law a judicial determination which creates a presumption of probable cause. *See, generally*, Gerstein v. Pugh, 420 U.S. 103, 117, 95 S.Ct 854, 865 (1975).

As their final effort at attacking the affidavit, defendants complain that in paragraph 58 Inspector Almaguer "misrepresented [the] FDA inquiry" (Doc 171-2, pp. 50-51 of 51). As with other paragraphs, defendants do not dispute the accuracy of the statements made. Rather, they appear to complain that the Magistrate Judge would not understand the paragraph. The supposed frailty of the Magistrate Judge's intellect is a recurrent theme in their Franks motion – their principal complaints about certain sentences in some of the paragraphs seem to rest on their belief that the Magistrate Judge simply couldn't have understood what the affidavit related. Once again, the government demurs. The Magistrate Judge in this case is extremely experienced and is well-known for his legal acumen.

It is noteworthy that Magistrate Judge Hogan is not the only judicial officer in this district that has made the determination that probably cause existed for the issuance of the warrant. At a hearing held on May 11, 2005, the following colloquoy occurred:

UNITED STATES: Your honor, we invite your Court's attention to the probable cause issue on all three warrants, the two for the search in the original seizure and the one underlying this complaint. I would be astounded if Your Honor found that those did not have probable cause. As you may recall, they're like 40 pages long. They're very detailed. They are not a perfunctory, put in front of the Magistrate and he'll sign anything else. These were given to him, he gave due consideration over the weekend, and I invite Your Honor to look at that again and revisit it because - -

THE COURT: There's no doubt in my mind there's probable cause in those affidavits.

1:05-cv-196 (Doc. 72, at 46, Ins. 7 - 18.[3]

---

[3] Additonally, the Honorable David Buenning of the Eastern District of Kentucky made a finding of probable cause for the issuance of a search warrant for the home computers of Jim Teegarden, then currently being held by the Boone County Sheriff's Office. The Affidavit in Support of that search warrant, as defendants concede in their Motion (at 156), is very similar to the one at issue here.

For the reasons described above, to include both the facts and the law, the defendants' demand for a <u>Franks</u> hearing is without merit. The defendants have the burden of proving either deliberate falsehood or reckless disregard for the truth. <u>U.S. v. Zimmer</u>, 14 F.3d 286 (6th Cir. 1994). Overarching this, the law dictates that the task of the issuing magistrate is simply to make a practical, common-sense decision whether, given all of the circumstances set forth in the affidavit before him, including the "veracity" and "basis of knowledge" of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place. And the duty of a reviewing court is simply to ensure that the magistrate had a substantial basis for concluding that probable cause existed. <u>Illinois v. Gates</u>, 462 U.S. 213, 103 S.Ct. 2317 (1983). The United States Supreme Court wrote that, "The process does not deal with hard certainties, but with probabilities. Long before the law of probabilities was articulated as such, practical people formulated certain common-sense conclusions about human behavior; jurors as factfinders are permitted to do the same - and so are law enforcement officers. Finally, the evidence thus collected must be seen and weighed not in terms of library analysis by scholars, but as understood by those versed in the field of law enforcement... As these comments illustrate, probable cause is a fluid concept-turning on the assessment of probabilities in particular factual contexts-not readily, or even usefully, reduced to a neat set of legal rules." <u>Illinois v. Gates</u>, 462 U.S. at 231-232, 103 S.Ct. at 2328-2329.

The United States respectfully submits that a <u>Franks</u> hearing is not merited and that this Court should deny this portion of the Omnibus Motion.

## II.    THE COURT SHOULD NOT SUPPRESS EVIDENCE THAT THE GOVERNMENT OBTAINED FROM THE DEFENDANTS' INTERNET SERVICE PROVIDERS .

Defendants have also moved to suppress all evidence that the government obtained from

four Internet service providers ("ISPs") – NuVox Communications ("NuVox"), Verio, NTT

Communications ("Verio"), MSNHotmail, and Yahoo! – through subpoenas and court orders[4]

issued pursuant to the Stored Communications Act ("SCA"), 18 U.S.C. § 2703 (collectively, "the

ISP subpoenas and court orders").  This request should be denied for multiple reasons.  First,

defendants' motion to suppress evidence from Verio, MSNHotmail, and Yahoo! should be

dismissed as moot because the government never reviewed the productions from those ISPs and

will not introduce information produced by those ISPs at trial.  Second, only an e-mail account

holder has standing to bring a Fourth Amendment challenge to suppress e-mail obtained from his

or her e-mail account.  No defendant has alleged facts establishing such an interest in the NuVox

e-mail account; it seems likely that only Steven Warshak can do so.  Third, defendants' Fourth

Amendment claim is based on the Sixth Circuit's recent holding in Warshak v. United States,

490 F.3d 455 (6th Cir. 2007) (hereinafter "Warshak I"), that the SCA is unconstitutional to the

extent it allows compelled disclosure of e-mail without a warrant and without prior notice to the

account holder.  However, the Supreme Court has held that the exclusionary rule does not apply

when the government obtains information in good faith reliance on a statute, even if the statute is

later declared unconstitutional.  Illinois v. Krull, 480 U.S. 340 (1987).  Finally, the statutory

---

[4]    Although defendants repeatedly characterize § 2703(d) orders as "subpoenas," (*see, e.g.*, Def. Mot. at 49), they are actually court orders that issue only if a court determines that the government has offered specific and articulable facts showing that there are reasonable grounds to believe that the requested evidence is relevant and material to an ongoing criminal investigation. *See* 18 U.S.C. § 2703(d).

violations that defendants allege do not provide a basis for suppression because no statutory
suppression remedy is available. For all of these reasons, the Court should deny defendants'
motion to suppress evidence obtained through the ISP subpoenas and court orders.

### A.  Defendants' motion to suppress evidence from Verio, MSNHotmail, and Yahoo! should be denied as moot.

As an initial matter, defendants' motion to suppress is moot insofar as it seeks to suppress
all evidence that the government obtained as a result of subpoenas and court orders to Verio,
Yahoo!, and MSNHotmail. The government has not reviewed – and will not review – any of the
material that these ISPs produced, and therefore no evidence in the case is even arguably
derivative of the challenged Verio, Yahoo!, and MSNHotmail subpoenas and court orders.

Defendants' challenge to the December 22, 2004, subpoena to Verio should be dismissed
as moot because, as defendants concede, Verio produced no documents in response to that
subpoena. (*See* Def. Mot. at 47 n.11.) Indeed, the government withdrew the December 22, 2004,
subpoena and issued the January 11, 2005, subpoena. Because no searches or seizures were
carried out in response to the December 22, 2004, Verio subpoena, all of defendants' objections
to that subpoena are moot.

In response to the January 11, 2005, subpoena to Verio, the case agents received
information from Verio on February 3, 2005. However, the case agents never accessed the
information produced by Verio. On July 11, 2005, the information from Verio was sent to the
FBI for processing, and the results of the FBI's processing were returned on August 11, 2005, in
the form of an unreadable CD and DVD. No information was extracted from the DVD that was
used in the case, and no e-mails were printed, reviewed, or provided to other case agents.

19

In response to the September 2005 court orders directed to Yahoo! and MSNHotmail, case agents received materials from Yahoo! on September 23, 2005, and from MSNHotmail on September 26, 2005. However, because case agents were by that time pursuing other investigatory leads, they never accessed or reviewed the information produced by Yahoo! or MSNHotmail. Importantly, Yahoo! sent a letter indicating that it would not comply because of 9th Circuit caselaw. MSNHotmail sent a password-protected CD, the password was never used by the agents.

In sum, the government will not seek to introduce at trial any of the information produced by Verio, Yahoo!, and MSNHotmail. In addition, because case agents never even reviewed this information, there can be no derivative evidence linked to these productions. Therefore, the Court should dismiss defendants' motion to suppress as moot with respect to these ISPs. *See, e.g.*, United States v. Johnson, 34 F. Supp. 2d 535, 536 n.1 (E.D. Mich. 1998) (stating that "this Court has denied as moot defendant's motion to suppress evidence as fruits of an illegal search and seizure of an automobile, due to the fact that the government does not intend to introduce any evidence seized from the vehicle in question"); United States v. Conley, 856 F. Supp. 1010, 1014 n.1 (W.D. Pa. 1994) (aff'd on other grounds, 92 F.3d 157 (3d Cir. 1996) (motions to suppress denied as moot where government stated that it would not introduce any evidence obtained from the allegedly illegal search and defendants had not identified any derivative evidence that was obtained solely from the challenged search).

**B.    With the possible exception of Steven Warshak, all defendants lack standing to challenge evidence obtained from NuVox.**

In their motion, defendants essentially ask the Court to suppress all evidence obtained via the ISP subpoenas and court orders with respect to all defendants, without differentiating

between the privacy interests of different defendants. However, "[i]t is well-established that 'Fourth Amendment rights are personal rights which, like some other constitutional rights, may not be vicariously asserted.'" United States v. Williams, 354 F.3d 497, 510-11 (6th Cir. 2003) (quoting Rakas v. Illinois, 439 U.S. 128, 133-34 (1978)). Accordingly, "'suppression of the product of a Fourth Amendment violation can be successfully urged only by those whose rights were violated by the search itself, not by those who are aggrieved solely by the introduction of damaging evidence. Co-conspirators and co-defendants have been accorded no special standing.'" Id. at 511 (quoting United States v. Padilla, 508 U.S. 77, 81-82 (1993) (per curiam)). Therefore, to prevail on the motion to suppress evidence from the ISPs under the Fourth Amendment, each defendant will have to show that his or her own Fourth Amendment rights were violated when a particular e-mail account was searched; it is not enough to show that evidence was obtained as a result of a violation of a co-defendant's Fourth Amendment rights.

In order to establish that his or her own Fourth Amendment rights were violated by a particular search, each defendant must first show that he or she had a subjective and legitimate expectation of privacy in the location that was searched. See United States v. Harris, 255 F.3d 288, 294 (6th Cir. 2001). Although individuals may have a reasonable expectation of privacy in the contents of their own e-mail accounts in certain circumstances, they have no legitimate privacy interest in other people's e-mail accounts, even if they exchange e-mails with those accounts. See Guest v. Leis, 255 F.3d 325, 333 (6th Cir. 2001) (a sender of e-mail "would lose a legitimate expectation of privacy in an e-mail that had already reached its recipient; at this moment, the e-mailer would be analogous to a letter-writer, whose 'expectation of privacy ordinarily terminates upon delivery' of the letter."). Indeed, the Sixth Circuit explicitly stated in

21

Warshak I that Warshak would not have maintained a reasonable expectation of privacy "vis-a-vis his e-mailing partners" and therefore could not successfully bring a Fourth Amendment challenge if the government received the contents of his e-mails by subpoenaing the person with whom he was e-mailing. Warshak I, 490 F.3d at 471. Accordingly, to the extent that each defendant has sought to suppress evidence obtained from e-mail accounts that belong to other people (including other defendants), those aspects of the suppression motion must be rejected for lack of standing.

Each defendant bears the burden of establishing his or her standing to assert a Fourth Amendment violation, United States v. Smith, 263 F.3d 571, 582 (6th Cir. 2001), and none of the defendants has attempted to make this showing with respect to the various e-mail accounts targeted by the subpoenas and court orders. Each defendant must identify his or her own e-mail accounts, and defendants will not have standing to challenge evidence obtained from accounts that belong to their co-defendants or to third parties. See Warshak I, 490 F.3d at 471. In particular, for the reasons set forth in the previous section, defendants' suppression motion should be denied as moot with respect to Verio, Yahoo!, and MSNHotmail, and therefore the only relevant question for standing purposes is which defendants, if any, have standing to challenge the evidence obtained from the Warshak Nuvox e-mail account. Assuming that Steven Warshak is the only defendant who establishes standing to challenge the NuVox evidence, the NuVox suppression claims of the remaining defendants should be dismissed on standing grounds.

C. **The good-faith exception to the exclusionary rule precludes suppression based on <u>Warshak I</u> or the alleged unconstitutionality of the SCA.**

Defendants argue that all evidence from NuVox should be suppressed because the government obtained the evidence via subpoenas and court orders that did not satisfy the Fourth Amendment.[5] (*See* Def. Mot. at 49, 51, 54.)  As defendants themselves repeatedly acknowledge (*see* <u>id.</u>), this argument is based on <u>Warshak I</u>, in which the Sixth Circuit held that the SCA was facially unconstitutional to the extent that it allowed the government to use subpoenas and 2703(d) orders to obtain e-mails from service providers without either a warrant supported by probable cause, prior notice to the account holder, or a showing that the user maintained no expectation of privacy in the e-mail.  <u>Warshak I</u>, 490 F.3d at 477.  The government believes that <u>Warshak I</u> was wrongly decided and requests the opportunity to file a supplemental brief if <u>Warshak I</u> is vacated or reversed.[6]  However, even if <u>Warshak I</u> remains the law of this Circuit, the good-faith exception to the exclusionary rule precludes suppression as a remedy for the e-mail produced in this case in response to subpoenas or 2703(d) court orders, as the government obtained the e-mail in good-faith reliance on the SCA.  *See* <u>Illinois v. Krull</u>, 480 U.S. 340, 349-50 (1987).  Furthermore, defendants cannot evade application of the good-faith exception by alleging that the government violated the SCA in certain respects because the constitutional flaw in the subpoenas and 2703(d) courts orders in this case is inherent in the SCA itself, upon which

---

[5] Defendants repeat this argument in moving to suppress evidence from Verio, Yahoo!, and MSNHotmail under the Fourth Amendment (*see* Def. Mot. at 47, 49, 54), but these duplicative arguments have the same infirmities as the NuVox argument and in any event should be denied as moot for the reasons discussed earlier in this section.

[6] The government's petition for rehearing *en banc* of <u>Warshak I</u> is currently pending before the Sixth Circuit.

the government was entitled to rely. Accordingly, the Court should reject defendants' request that the NuVox evidence be suppressed on Fourth Amendment grounds based on Warshak I and the alleged unconstitutionality of the procedures established by the SCA.

### 1. The good-faith exception to the exclusionary rule.

As the Supreme Court has explained, "the 'prime purpose' of the exclusionary rule 'is to deter future unlawful police conduct and thereby effectuate the guarantee of the Fourth Amendment against unreasonable searches and seizures.'" Krull, 480 U.S. at 347 (1987) (quoting United States v. Calandra, 414 U.S. 338, 347 (1974)). "As with any remedial device, application of the exclusionary rule properly has been restricted to those situations in which its remedial purpose is effectively advanced." Id. For this reason, the Supreme Court has refused to expand the use of the exclusionary rule to situations where suppression would not have the desired deterrent effect. See, e.g., United States v. Leon, 468 U.S. 897, 916-23 (1984) (holding that the exclusionary rule should not be applied to evidence obtained by a police officer who reasonably relied on a search warrant issued by a neutral magistrate, even if the warrant was ultimately found to be defective, because suppression would not have the desired deterrent effect).

In Krull, the Supreme Court applied the same approach and held that evidence should not be suppressed if it was obtained by an officer who acted in objectively reasonable reliance on a statute that was later declared to be unconstitutional. 480 U.S. at 349-50. In reaching this conclusion, the Court reasoned that "[u]nless a statute is clearly unconstitutional, an officer cannot be expected to question the judgment of the legislature that passed the law." Id. As the Court explained, "[p]enalizing the officer for the legislature's error, rather than his own, cannot logically contribute to the deterrence of Fourth Amendment violations." Id. at 350 (brackets and

24

citation omitted). The Court also rejected the idea that the exclusionary rule would act as "a significant, additional deterrent" to legislatures, who are already effectively deterred by the power of the courts to invalidate unconstitutional statutes. Id. at 351-52.

In this case, the exclusionary rule should not be applied because the government's reliance on the SCA was objectively reasonable. Significantly, the defendants do not even attempt to argue that the government's reliance on the SCA was unreasonable; instead, their argument is based on assertions that the government did not comply with the SCA. (*See* Def. Mot. at 57-58.)

In any case, it was objectively reasonable for the government to rely on the subpoenas and 2703(d) orders to obtain e-mail because nothing in the SCA's provisions suggests that "a reasonable officer should have known that the statute was unconstitutional." *See* Krull, 480 U.S. at 355. The SCA was enacted in 1986. When the subpoenas and 2703(d) orders were issued in this case, the government had been relying on the SCA for nearly 20 years, and no court had ever ruled the SCA to be unconstitutional. *See* United States v. Ferrara, 771 F. Supp. 1266, 1298 (D. Mass. 1991) (finding that "it certainly cannot be said that the agents involved should have known that the statute was unconstitutional" when, *inter alia*, "there were no cases addressing the constitutionality of § 2518(11)(a) at the time the FBI executed the Order in this case"); *see also* United States v. Johnson, 408 F.3d 1313, 1323 (10th Cir. 2005) (finding that it was objectively reasonable for an officer to rely on a statute where, *inter alia*, he had previously conducted six to ten similar searches under the statute). In addition, there is a "strong presumption of constitutionality" due to federal statutes challenged on Fourth Amendment grounds. United States v. Watson, 423 U.S. 411, 416 (1976). The reasonableness of the government's reliance on

the SCA is also bolstered by cases such as <u>Oklahoma Press Publishing Co. v. Walling</u>, 327 U.S.

186, 208 (1946), in which the Supreme Court held that a reasonableness standard, not probable

cause, applied to compelled disclosure.[7]  Finally, the fact that the 2703(d) court orders were

issued by a neutral magistrate further demonstrates that they were not clearly unconstitutional

and that the government's reliance on them was not unreasonable.  <u>Cf. Leon</u>, 468 U.S. at 921.

Moreover, since <u>Warshak I</u>, one other district court has applied the good-faith exception

in rejecting a motion to suppress e-mail content obtained pursuant to 2703(d) order.  <i>See</i> <u>United</u>

<u>States v. Ferguson</u>, ___ F. Supp. 2d ___, 2007 WL 2660260 (D.D.C. Sept. 10, 2007).  In <u>Ferguson</u>,

the court concluded that the government's reliance on the SCA was objectively reasonable

because (1) Acts of Congress are entitled to a strong presumption of constitutionality, (2) the

SCA was not ruled unconstitutional by any court until twenty years after its enactment, (3) no

court had found the SCA to be unconstitutional when the government applied for the 2703(d)

orders at issue in the case, and (4) a neutral magistrate approved the government's applications

for 2703(d) orders.  <u>Id</u>. at *2.  With respect to the last factor, the court elaborated that "[l]aw

enforcement officers are entitled to rely on the legal judgment of a neutral magistrate" and

explained that "'[i]n the ordinary case, an officer cannot be expected to question the magistrate's

probable-cause determination or his judgment that the form of the warrant is technically

sufficient.'"  <u>Id</u>. (quoting <u>Leon</u>, 468 U.S. at 921).  The same reasoning applies here[8] and supports

---

[7] Because defendants do not challenge the reasonableness of the government's reliance on the
SCA, the government will not repeat its arguments for the constitutionality of the SCA from its
briefs in <u>Warshak I</u>.  Although these arguments were subsequently rejected by the Sixth Circuit
in <u>Warshak I</u>, they nonetheless support the reasonableness of the government's reliance on the
SCA.

[8] The 2703(d) court orders in this case were issued by a neutral magistrate; the grand jury
subpoenas of course were not.  The same Magistrate Judge (MJ Hogan) who signed the search
warrants discussed elsewhere in this response.

the conclusion that the good-faith exception to the exclusionary rule should apply in this case to preclude suppression based on the alleged unconstitutionality of SCA procedures. Importantly, Magistrate Judge Hogan signed the NuVox 2703(d) Order on May 13, 2005, less than 2 months after approving the probable cause affidavit for the March 16, 2005 warrants.

### 2. The alleged SCA violations do not affect the applicability of the good-faith exception.

Defendants acknowledge the good-faith exception to the exclusionary rule, but they attempt to evade its application here by claiming that the government's alleged SCA violations prevent it from establishing that it relied in good faith on the constitutionality of the statute. (Def. Mot. at 57-60.) The government disputes defendants' claim that it "repeatedly violated even the SCA's unconstitutional standards" (Def. Mot. at 59), *see infra*, but even if defendants could establish the SCA violations they allege, they would still not be entitled to suppression because the constitutional flaw in the subpoenas and 2703(d) court orders in this case is inherent in the SCA itself, upon which the government was entitled to rely. This court should reject defendants' attempt to bootstrap allegations of violations of the statute to justify suppression.

Defendants suggest that the good-faith exception does not apply if the government deviated in any way from the SCA, but the cases they cite simply do not support this proposition. These cases address situations in which law enforcement alone has erred, not the legislature. Instead, the good-faith exception applies because under Warshak I, the constitutional error in this case was committed by Congress in enacting the SCA. Defendants rely primarily on United States v. Herrera, 444 F.3d 1238 (10th Cir. 2006), but that case does not even involve an

---

unconstitutional statute.[9]  In Herrera, a state trooper violated the Fourth Amendment by randomly stopping a noncommercial truck based on his mistaken belief that the truck fell within a statute that authorized warrantless stops of commercial vehicles.  Id. at 1242-48.  The defendant "[did] not challenge the validity of the Kansas statutory scheme regulating motor carriers."  Id. at 1244.  The Tenth Circuit reasoned that the good-faith exception should not apply because "it was the state trooper's own factual mistake that led to the Fourth Amendment violation that occurred in this case."  Id. at 1249.

In contrast, in this case, the Fourth Amendment violation occurred because the SCA authorizes compelled disclosure of e-mail without a warrant and without prior notice to the account holder, a combination that the Sixth Circuit subsequently ruled in Warshak I to be facially unconstitutional.  The government was acting squarely within the scope of the SCA when it used subpoenas and 2703(d) orders, rather than search warrants, to obtain e-mail from NuVox.  See 18 U.S.C. § 2703(b)(1), 2703(d), & 2705.  Thus, Krull's caution (in dicta) that the good-faith exception may not apply when "the relevant actors are not legislators or magistrates, but police officers," Krull, 480 U.S. at 360 n.17, is irrelevant to this case.  Accordingly, defendants' case falls squarely within the good-faith exception, and their attempt to suppress evidence based on Warshak I and the alleged unconstitutionality of the SCA should therefore be denied.

Defendants' arguments are also contrary to Ferguson's application of the good-faith exception to the 2703(d) orders in that case.  Like the defendants in this case, the defendant in

---

[9] Similarly, the other case relied upon by defendants, United States v. Anderson, Case No. 4:07cr0023 (N.D. Ohio, June 21, 2007) (U.S. Dist. LEXIS 45137), considers the application of the good-faith exception to a mistake by a police officer.  It too has nothing to do with an unconstitutional statute or a legislative error.

Ferguson argued that the applications for the challenged 2703(d) orders "did not comply with the provisions of the SCA because the Government failed to provide 'reasonable grounds' in its applications." Ferguson, __ F. Supp. 2d __, 2007 WL 2660260, at *3. The court nevertheless applied Krull's good-faith exception to the exclusionary rule. *See id.* at *2-*3.

### D. Defendants are not entitled to suppression for the other violations they allege.

Defendants also claim that the government violated the SCA when it obtained evidence from NuVox.[10] However, because the SCA does not provide for a suppression remedy, defendants are therefore not entitled to suppression for the statutory violations they allege. Furthermore, the government disputes defendants' characterization of its actions in this case and any suggestion that the government repeatedly violated the SCA.

### 1. The SCA does not provide for a suppression remedy in this case.

The law is unequivocal that the SCA does not provide a suppression remedy. 18 U.S.C. § 2708 ("The [damages] remedies and sanctions described in this chapter are the only judicial remedies and sanctions for nonconstitutional violations of this chapter."); Ferguson, __ F. Supp. 2d __, 2007 WL 2660260, at *3 ("[The SCA] does not provide for a suppression remedy"); United States v. Smith, 155 F.3d 1051, 1056 (9th Cir. 1998) ("the Stored Communications Act expressly rules out exclusion as a remedy"); United States v. Kennedy, 81 F. Supp. 2d 1103, 1110 (D. Kan. 2000) ("[S]uppression is not a remedy contemplated under the ECPA."); United States v. Hambrick, 55 F. Supp. 2d 504, 507 (W.D. Va. 1999) ("Congress did not provide for suppression where a party obtains stored data or transactional records in violation of the Act."),

---

[10]     Defendants make similar complaints about the government's actions in obtaining evidence from Verio, Yahoo!, and MSNHotmail under the Fourth Amendment (*see* Def. Mot. at 46-49, 53), but these duplicative arguments have the same infirmities the NuVox arguments and in any event should be denied as moot for the reasons discussed earlier in this section.

*aff'd*, 225 F.3d 656, 2000 WL 1062039 (4th Cir. 2000); United States v. Reyes, 922 F. Supp. 818, 837-38 (S.D.N.Y. 1996) ("Exclusion of the evidence is not an available remedy for this violation of the ECPA. . . . The remedy for violation of [18 U.S.C. § 2701-11] lies in a civil action."). Because the SCA does not provide a statutory suppression remedy when the government obtains electronic communications in violation of the statute, defendants are not entitled to suppression for the statutory violations they allege.[11]

2. **Defendants' various complaints about the NuVox subpoena and court order do not provide a basis for suppression.**

Based on the reasoning set forth above, defendants' motion is moot with respect to the Verio, Yahoo!, and MSNHotmail evidence. To the extent that any defendant establishes standing to challenge the information produced by NuVox, the good-faith exception to the exclusionary rule precludes suppression, and neither the SCA nor Title III provides for a statutory suppression remedy.

Even though the government's arguments dispose of defendants' suppression motion with respect to all evidence obtained via ISP subpoenas and court orders, the government takes issue with defendants' inaccurate and inflammatory allegations about its conduct in this case and now seeks to rebut some of defendants' more egregious and pervasive claims. In making these arguments, the government does not intend to suggest that suppression would be appropriate if defendants could establish the statutory violations they allege, nor does it concede the truth or accuracy of allegations that it does not address.

---

[11] Similarly, the Wiretap Act also does not provide a statutory suppression remedy for interception of electronic (as opposed to wire or oral) communications. *United States v. Steiger*, 318 F.3d 1039, 1052 (11th Cir. 2003) ("The Wiretap Act does not provide a suppression remedy for electronic communications unlawfully acquired under the Act.").

*"Electronic storage" definition.* Defendants criticize the government for including the following statement in its January 2005 subpoenas and in its 2703(d) applications: "Communications not in 'electronic storage' include any e-mail communications received by the specified accounts that the owner or user of the account has already accessed, viewed, or downloaded." (*See* Def. Mot. at 48, 50, 53.) According to defendants, this statement amounts to a "re-definition of the term 'electronic storage'" that results in "a[n] unprecedented and convoluted reading of the SCA." (Id. at 48.) Defendants' criticism is unjustified. First, and perhaps most importantly, the government's definition of "electronic storage" was adopted by Magistrate Judge Timothy S. Hogan in each of the three 2703(d) orders he issued in the case, which confirms the propriety of the government's interpretation. Furthermore, the government's interpretation of "electronic storage" is neither convoluted nor unprecedented; in fact, it is wholly consistent with the language of the SCA and has been confirmed by multiple courts.

In the SCA, "electronic storage" does <u>not</u> simply mean storage of information by electronic means. Instead, "electronic storage" is "(A) any temporary, intermediate storage of a wire or electronic communication incidental to the electronic transmission thereof; and (B) any storage of such communication by an electronic communication service for purposes of backup protection of such communication." 18 U.S.C. § 2510(17). Previously opened e-mail messages stored by a service provider for a customer plainly do not fall within the scope of the first component of this definition, as such e-mail messages are neither in "temporary, intermediate storage" nor stored incident to transmission. *See* <u>Fraser v. Nationwide Mut. Ins. Co.</u>, 352 F.3d 107, 114 (3d Cir. 2004) (stating that e-mail in post-transmission storage was not in "temporary, intermediate storage"). Such messages also do not fall within the scope of § 2510(17)(B), which, by its terms, is restricted only to storage "by an electronic communication service for purposes of

31

backup protection." This latter provision encompasses backup copies made by an electronic communication service to protect against system failure and includes only copies of communications which are themselves in temporary, intermediate storage at the time the copy is made, rather than messages that have already been transmitted and stored by the user. *See* Fraser v. Nationwide Mut. Ins. Co., 135 F. Supp. 2d 623, 636 (E.D. Pa. 2001), *aff'd in part on other grounds*, 352 F.3d 107 (3d Cir. 2004) (affirming the SCA portion of the district court's ruling on other grounds).

Although defendants correctly note that the Ninth Circuit rejected the government's interpretation of 18 U.S.C. § 2710(17) in Theofel v. Farey-Jones, 359 F.3d 1066 (9th Cir. 2004), the reasoning in *Theofel* should be rejected because it confuses "backup protection" with ordinary storage of a file. *See* id. at 1075-76. Indeed, at least one district court has explicitly rejected the Ninth Circuit's reasoning in Theofel and compelled Hotmail to disclose the content of e-mail in response to a grand jury subpoena issued pursuant to § 2703(b)(1)(B). *See* In re Grand Jury Subpoena Issued Pursuant to 18 U.S.C. Section 2703(b)(1)(B), (M.D. Ga. Apr. 29, 2005) (attached as Exhibit 10). The court held that "[t]he unopened emails in question and maintained by Hotmail are not in 'electronic storage'" and that their disclosure could thus be compelled pursuant to subpoena. Id. at 7. *See also Orin S. Kerr, A User's Guide to the Stored Communications Act, and a Legislator's Guide to Amending It*, 72 Geo. Wash. L. Rev. 1208, 1217 & 1217 n.61 (2004) (explaining why "Theofel is quite implausible and hard to square with the statutory text").

*Information not covered by the SCA*. Defendants assert that the government "succeeded in misleading the Magistrate into believing that the data sought was not even covered by the SCA." (*See* Def. Mot. at 51.) There is simply no basis for this baffling assertion – it is unclear

32

why the government would seek, or a magistrate would grant, SCA process intentionally aimed at information that falls outside the scope of the SCA. In general, if an entity has information that falls outside the scope of the SCA, the government simply uses a grand jury subpoena to compel its production, and the complex procedures of the SCA do not come into play. In any case, the 2703(d) orders in this case sought two general classes of information, both covered by the SCA. First, they sought various non-content information related to customers or subscribers of an electronic communication service; all such information is available pursuant to 18 U.S.C. § 2703(c)(1)(B) & (d). Second, the government sought the contents of wire or electronic communications not in electronic storage unless greater than 181 days old; all such information is available pursuant to 18 U.S.C. § 2703(b)(1)(B)(ii) & (d).

*"Specific and articulable facts" in the 2703(d) applications.* Defendants also claim that each of the government's 2703(d) applications was factually deficient, and defendants further note that the Sixth Circuit has rejected claims of good-faith reliance on a magistrate's finding of probable cause when the agents supplied the magistrate with few facts. (See Def. Mot. at 50-51, 53, 60.) A 2703(d) order, however, is based on a standard lower than probable cause: it "is a standard higher than a subpoena, but not a probable cause warrant." H. Rep. No. 103-827(I), at 31 (1996), *reprinted in* 1996 U.S.C.C.A.N. 3489, 3511. Here, although the factual information set forth in the 2703(d) order applications could certainly have been more detailed, the applications nevertheless explained the connection between the investigation and the information sought by the government. For example, the NuVox application stated that the government "was investigating a large-scale mail and wire fraud operation," that NuVox "provides electronic communication services to individual(s) of the investigation," and that current and former employees "suggest that electronic mail is a vital communication tool that has been used to

perpetrate the fraudulent conduct." From these facts, a magistrate could conclude that "there are reasonable grounds to believe that" the information sought by the government was "relevant and material to an ongoing criminal investigation." 18 U.S.C. § 2703(d). Here, the government sought and obtained a 2703(d) order from Magistrate Judge Hogan, the same Magistrate Judge who signed the 3/16/05 search warrants, and the government was entitled to rely on that order. See Leon, 468 U.S. at 921.

Finally, it is important to note that under the SCA, any e-mail that can be obtained pursuant to 2703(d) order can also be obtained through a subpoena, which requires no factual showing whatsoever. See 18 U.S.C. § 2703(b)(1)(B). Thus, it would make particularly little sense to suppress e-mail based on the level of factual showing made by the government to obtain a 2703(d) order, as the government could alternatively have obtained the same e-mail via subpoena.

*Delayed notice requests in the 2703(d) applicatons.* Defendants also claim that the government's applications for the 2703(d) orders to NuVox, Yahoo!, and MSNHotmail were deficient because they failed to justify the delayed notification of the account holders. (Def. Mot. at 50, 53.) However, each 2703(d) application explained that disclosure would give the account holder "an opportunity to destroy evidence, notify confederates, or flee or continue his flight from prosecution." From this representation, it was sufficient for the magistrate to conclude, as required by 18 U.S.C. § 2705(a), that prior notification would seriously jeopardize the government's investigation. Nothing in either 18 U.S.C. § 2703 or 18 U.S.C. § 2705 requires a more detailed justification. As is evident from the court's subsequent orders to delay notification of each of the 2703(d) orders, the Magistrate Judge found the government's representations to be

34

sufficient to satisfy the standards of § 2705(a)(1)(A), and the government was entitled to rely on that judgment.

 *Compliance with the delayed notice provisions of the 2703(d) orders.* Defendants also claim that the government violated the terms of each of the 2703(d) orders because it did not notify Steven Warshak of the orders upon the expiration the 90-day period set by § 2705(a)(1)(A).[12] (Def. Mot. at 52, 53.) This allegation is unwarranted. The 2703(d) orders simply mandated that "the notification by the government otherwise required under 18 U.S.C. § 2703(b)(1)(B) be delayed for ninety days"; they did not order the government to make notifications immediately upon the expiration of that period. Accordingly, although the government does not dispute that it violated § 2703 by inadvertently waiting more than 90 days to provide notice to Mr. Warshak, that delay did not violate the terms of any of the 2703(d) orders.[13]

### E. Defendants' request for a taint hearing is premature and should be denied.

 In Section II.B of their brief, defendants expound at length about the need for an evidentiary hearing to determine the extent of the "taint" that resulted from the alleged violations of defendants' Fourth Amendment rights, and they also engage in premature legal and factual analysis about the possible scope of such taint. For the reasons set forth above, the government believes that a taint hearing is unnecessary because none of the evidence produced in response to the ISP subpoenas and court orders should be suppressed. However, in the event that the Court

---

[12] Although defendants refer to this 90-day period as a "sealing period" and a "period of secrecy," these terms do not accurately describe the delayed notice period set by § 2705(a)(1)(A).

[13] It would be particularly inappropriate to suppress the e-mail as a result of the government's failure to follow the procedures of 18 U.S.C. § 2705(a)(4) for extending delayed notice. At the time the government should have sought to extend the period of delay, the government was of course already in possession of the e-mail. Thus, the government's error was not a "but-for" cause of obtaining the e-mail, and but-for causality is "a necessary, not a sufficient, condition for suppression." Hudson v. Michigan, 126 S. Ct. 2159, 2164 (2006).

decides that an evidentiary hearing is necessary, the government respectfully requests that it be given the opportunity to present evidence on possible taint.

## III.   THE DEFENDANTS' CLAIM TO "OUTRAGEOUS" EXECUTIONS OF THE SEARCH WARRANTS IS FALSE.

The defendants spend many pages in their Omnibus Motion and in the attachments thereto making allegations against the government agents executing the search warrants. The United States proffer that Inspector Almaguer and the other government agents flatly deny such feckless allegations and would testify that at no time did they or anyone else observe any breaches of etiquette or propriety by the searching law enforcement officials. This portion of the Omnibus Motion is wholly without basis in truth and should be denied.

## IV.   THERE ARE NO FACIAL DEFECTS IN THE WARRANTS OR THE AFFIDAVIT.

The arguments offered by the defendants in support of this portion of the Omnibus Motion are essentially restatements of the ones they made in other portions of the memorandum, i.e., in their demand for a <u>Franks</u> hearing. The United States incorporates its responses from that portion into this segment. In this portion, they use a piecemeal attack on the twenty-two (22) page, sixty-five (65) paragraph affidavit to again try to diffuse the Court's analysis of probable cause onto single sentences and parts of paragraphs, clearly hoping to avoid a cumulative, cohesive reading of the affidavit or even of whole paragraphs. The truth is that the existence of each of these things in the subject paragraphs did in fact and effect facilitate the fraud scheme.

The defendants also complain that the warrants were "overbroad". This argument is also without merit. The Fourth Amendment to the United States Constitution requires a warrant to "particularly describ[e] the place to be searched, and the persons or things to be seized." *U.S. Const. amend. IV.* The purpose of this particularity requirement is to prevent the use of general

36

warrants authorizing wide-ranging rummaging searches in violation of the Constitution's proscription against unreasonable searches and seizures. *See* Andresen v. Maryland, 427 U.S. 463, 480, 96 S.Ct. 2737 (1976); United States v. Schultz, 14 F.3d 1093, 1098 (6th Cir.1994); *see also* United States v. Blakeney, 942 F.2d 1001, 1026 (6th Cir.1991) (recognizing that the warrant must enable a searcher to reasonably ascertain and identify the things which are authorized to be seized). The Sixth Circuit has recognized that the issue of whether a warrant is general, or lacks the requisite particularity, is best resolved upon examination of the circumstances of the particular case. *See* White Fabricating Co. v.. United States, 903 F.2d 404, 411 (6th Cir.1990); *see also* United States v. Blair, 214 F.3d 690, 697 (6th Cir. 2000) (stating that "the degree of specificity in a warrant must be flexible, depending upon the type of items to be seized and the crime involved"); United States v. Henson, 848 F.2d 1374, 1383 (6th Cir.1988) (finding that the particularity required depends on the items sought and the specific circumstances in the case). A description contained in a warrant is sufficiently particular if it is as specific as the circumstances and the nature of the alleged crime permit. Blair, 214 F.3d at 697. In addition, once a category of documents has been adequately described in the warrant, in part by an illustrative list of items to be seized, the Fourth Amendment is not violated when officers executing the warrant exercise minimal judgment as to whether a particular document falls within the described category. *See* id.

In the case United States v. Logan, 250 F.3d 350 (6th Cir 2001), the Sixth Circuit upheld the District Court's determination that the search warrant satisfied the particularity requirement. The search warrant in Logan authorized the seizure of items specifically related to false or fraudulent activity taking place within the context of co-insured loans and mortgage-backed securities. In particular, items such as records, files, documents, notes, correspondence, microfiche, or computerized entries concerning the loan insurers, the lenders, manufactured

37

home dealers, borrowers both past and present, payment history and current loan status of borrowers, loan applications, and copies of submissions to the loan insurers and lenders, insurance claims to the loan insurers, and other claims records could logically lead to evidence that certain persons were involved in the suspected illegal activity. In that case, the defendants' argument concerning the particularity requirement was based upon their position that investigating officers dug too deeply into the overall business of the umbrella company instead of focusing on one portion of the operation that was alleged to have involved illegal practices. The Sixth Circuit panel wrote, "Appellants miss the point", finding it "clear" that the warrant's general nature was due to the investigators' belief that the defendants' fraud scheme reached its entire operation. Logan, 250 F.3d at 365. "That being the case, law enforcement officials were necessarily involved in an examination of an extensive paper trail in order to discover which transactions may have been illegal in nature. Keeping in mind that the particularity requirement is determined relative to the specific circumstances in each case, we find that the items sought in light of the illegal activity alleged were appropriate." Logan, id. In this case as in Logan, the investigation clearly warranted a belief that evidence could be found in all parts of Berkeley's/Warshak's operation and as such, did not violate the particularity requirement of the Fourth Amendment.

Furthermore, even were this Court to find that the warrant lacked sufficient particularity under the Fourth Amendment, the Omnibus Motion's demand to suppress should still be denied under the good faith exception to the exclusionary rule outlined in United States v. Leon, 468 U.S. 897, 918-21, 104 S.Ct. 3405 (1984). See Schultz, 14 F.3d at 1098. The good faith exception to the exclusionary rule states that the fruits of a constitutionally infirm search need not necessarily be suppressed unless: (1) the warrant contained a knowing or reckless falsehood; (2)

the issuing judge acted as a mere "rubber stamp" for the police; or (3) the warrant and the affidavit, even after extending appropriate deference to the issuing judge's determination, did not establish probable cause or possessed a technical deficiency such that the executing officers cannot reasonably assume the warrant to be valid. Leon, 468 U.S. at 922-23, 104 S.Ct. 3405.

In the instant matter, there exists no credible evidence that Inspector Almaguer gave a knowingly false affidavit or otherwise acted in bad faith upon seeking the search warrant. The warrant was issued by a proper authority, namely United States Magistrate Judge Timothy Hogan. Furthermore, the record is devoid of any credible evidence that Magistrate Judge Hogan abandoned his neutral role when he issued the warrant. Finally, it cannot be credibly said that this warrant was "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable." Schultz, 14 F.3d at 1098. This being the case, the officers' good faith reliance on the warrant in executing the search was, indeed, reasonable. Therefore, under either scenario, the evidence obtained from the search warrant at issue properly survives the defendants' Omnibus motions to suppress.

Again, the task of the issuing magistrate is simply to make a practical, common-sense decision whether, given all of the circumstances set forth in the affidavit before him, including the "veracity" and "basis of knowledge" of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place. And the duty of a reviewing court is simply to insure that the magistrate had a substantial basis for concluding that probable cause existed. Illinois v. Gates, 462 U.S. 213, 103 S.Ct. 2317 (1983). The United States Supreme Court wrote that, "The process does not deal with hard certainties, but with probabilities. Long before the law of probabilities was articulated as such, practical people formulated certain common-sense conclusions about human behavior; jurors as