UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

```
UNITED STATES OF AMERICA,      .
                               .  Case No. 1:06-cr-111-1
          Plaintiff,           .
                               .
     - v -                     .
                               .  *Status Conference*
STEVEN E. WARSHAK,             .
                               .
          Defendant.           .
. . . . . . . . . . . . . . .
UNITED STATES OF AMERICA,      .
                               .  Case No. 1:06-cr-111-2
          Plaintiff,           .
                               .
     - v -                     .
                               .  Wednesday, April 13, 2011
HARRIET WARSHAK,               .  2:05 PM
                               .
          Defendant.           .  Cincinnati, Ohio
. . . . . . . . . . . . . . .
```

TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE S. ARTHUR SPIEGEL, SENIOR JUDGE


<u>APPEARANCES</u>:

For the Plaintiff:      MARK L. JOSEPHS, ESQ.
                        U.S. Department of Justice
                        Office of Consumer Litigation
                        P.O. Box 386
                        1331 Pennsylvania Avenue, N.W.
                        Suite 950N
                        Washington, DC  20044

For the Defendant       MARTIN G. WEINBERG, ESQ.
Steven E. Warshak:      20 Park Plaza
                        Suite 905
                        Boston, Massachusetts  02116

For the Defendant       MARTIN PINALES, ESQ.
Harriet Warshak:        Strauss & Troy
                        The Federal Reserve Building
                        150 East Fourth Street
                        Cincinnati, Ohio  45202-4018


*Proceedings recorded in stenotype;*
*transcript prepared by computer.*

1    <u>APPEARANCES (Continued)</u>:

2    Also present:            Robert C. Frommeyer, Jr., Probation
                              Officer
3
     Law Clerks:              Keith E. Syler, Esq.
4                             Chandra Napora, Esq.

5    Court Reporter:          Luke T. Lavin, RDR, CRR
                              838 Potter Stewart U.S. Courthouse
6                             100 East Fifth Street
                              Cincinnati, Ohio  45202
7

8                                  - - -

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

P R O C E E D I N G S

1

2    (In chambers at 2:05 PM.)

3       THE COURT:  Well, I guess the first thing I have to

4  ask you, do I have jurisdiction to conduct this conference?

5     I'll start with the government.  Is there a motion for

6  certification, motion to certify filed?  Do you know if the

7  certiorari is?

8       MR. WEINBERG:  No, no.

9       THE COURT:  Okay.  And I guess the mandate come down.

10      MR. JOSEPHS:  Yes.

11      MR. PINALES:  The mandate has come down.

12      THE COURT:  And so that I do have jurisdiction?

13      MR. PINALES:  Yes, Your Honor.

14      THE COURT:  Are you within time, or has the time

15  passed to file a motion for certiorari?

16      MR. WEINBERG:  We have a few more weeks to file the

17  certiorari motion, but we have not asked for a stay, and we

18  completely agree that Your Honor has complete authority over

19  the resentencing.

20      THE COURT:  Okay.  Well, I'll ask the United States

21  first.  What's left for me to do by the court of appeals?

22      MR. JOSEPHS:  Well, Your Honor, the court of appeals

23  simply remanded to get a better explanation of the loss figure

24  that was used in the sentencing calculation.  And it was a

25  little confusing, because at the statement prior to the

1    sentencings Your Honor said there would be a -- the loss was a

2    hundred million based upon the statements of facts accompanying

3    the plea agreements that the cooperators entered into.  And

4    then at both Steven Warshak and Harriet Warshak's sentencing

5    Your Honor used a loss figure of over 400 million.

6              THE COURT:  The statement I made at the time of

7    sentencing before actually imposing the sentences on each of

8    the individuals.

9              MR. JOSEPHS:  Right.

10             THE COURT:  Okay.

11             MR. JOSEPHS:  That was where you said a hundred

12   million, and then at the actual sentencings for the Warshaks

13   you said over 400 million, and the court simply remanded to get

14   a better explanation.  And it's our view that Your Honor --

15             THE COURT:  I think I probably got the idea from the

16   probation department.

17        Do you know anything about it --

18             MR. FROMMEYER:  Yes, Your Honor.

19             THE COURT:  -- Mr. Frommeyer?

20             MR. FROMMEYER:  Yes.  As Mr. Josephs has put it,

21   that's my understanding, our understanding of the situation.

22             THE COURT:  How did I use 400 million?  I know 450

23   million was something based on, I guess, the gross receipts.

24             MR. FROMMEYER:  Right.  And actually in the

25   presentence report in our calculations we used the $400 million

 1    figure.  However, I guess there was a meeting with all of the

 2    defendants prior to sentencing that at that time, Your Honor,

 3    you stated that you were going to use the 100 million -- over a

 4    hundred million dollar loss figure and then, at sentencing,

 5    used essentially what was in the presentence report there.

 6          So this may make it easier if I just said this from the

 7    probation officer's point of view.  If you use the $100 hundred

 8    million figure, it's going to be the same Guideline calcula-

 9    tions if you use the higher one.  And the reason is is because

10    he was facing a life sentence based on the Guideline calcula-

11    tions, and if you reduce the loss figure, even if -- and

12    there's a four-level reduction in that, it would still be life.

13          THE COURT:  As a maximum?

14          MR. FROMMEYER:  As the sentence as far as the

15    Guideline imprisonment range is concerned.  So --

16          THE COURT:  I departed from it, I take it.

17          MR. FROMMEYER:  Yes.  And you actually levied a 25-

18    year sentence through a variance.  So it really doesn't matter.

19    If you use the smaller loss figure, it would essentially -- you

20    would --

21          THE COURT:  Since you're very bright, Mr. Frommeyer,

22    why in the devil did the court of appeals send it back for

23    resentencing if it really, in effect, doesn't make any

24    difference?

25          MR. FROMMEYER:  Because I think that they were wanting

1  justification for the higher loss figure under the 3553.

2  THE COURT:  Should I blame it on the parole depart-

3  ment?

4  MR. FROMMEYER:  I'm sorry?

5  THE COURT:  Should I blame it on probation?  I used

6  the one you suggested or your office suggested.

7  MR. FROMMEYER:  I think they were looking for the

8  justification, if I'm correct.

9  MR. JOSEPHS:  Yes.

10  THE COURT:  Well, that's the justification, I think.

11  MR. FROMMEYER:  Right.

12  THE COURT:  What do you have to say about that, Mr.

13  Josephs?

14  MR. JOSEPHS:  Your Honor, the government agrees that

15  if the hundred million dollar figure is used, the Guideline

16  range doesn't change.  And since Your Honor departed down for

17  both Harriet Warshak and Steve Warshak, even if you reduce the

18  points by four, you're still at the same Guideline range.

19  THE COURT:  All right.  I guess it's -- now should I

20  go with you, Mr. Weinberg?  What do you believe?

21  MR. WEINBERG:  Well, I believe that the court of

22  appeals sent it back to Your Honor for resentencing.  They

23  didn't limit it to --

24  THE COURT:  What do you mean by resentencing?

25  MR. WEINBERG:  For Your Honor to conduct a new

 1   sentencing decision and hearing on Steve Warshak and --

 2          THE COURT:  What do I take into account if I

 3   resentence now compared to what I did back in, what was it, May

 4   of 2010?  Would I use the same factors and considerations in

 5   imposing sentence?

 6          MR. WEINBERG:  Well, there would be at least one new

 7   or two new ones.

 8          THE COURT:  What are they?

 9          MR. WEINBERG:  The Supreme Court decided this year in

10   a case called *Pepper v. U.S.* that post-offense conduct and

11   rehabilitation should be considered whenever a court is

12   conducting resentencing as you would be with Mr. Warshak.  For

13   whatever reason it came back --

14          THE COURT:  Okay.

15          MR. WEINBERG:  -- not just for a single factor.

16          THE COURT:  It used to be in the Sixth Circuit there

17   was always a problem when they remand for resentencing, whether

18   the Court could change a sentence, could really do it all over

19   again, or whether it was bound to stay within the narrow

20   confines of the remand.

21      Do you know what I'm talking about?

22          MR. WEINBERG:  I do, Your Honor.

23          THE COURT:  And I didn't read any confines to the

24   remand.  How does the government view that?

25          MR. JOSEPHS:  Confines in terms of what you can --

```
1              THE COURT:  Sending it back to me for resentencing.
2              MR. JOSEPHS:  Yes, Your Honor.  The sentence was
3    vacated, so Your Honor does have to do a resentencing.
4              THE COURT:  So I don't have to worry about the
5    sentence that's been vacated, so I can impose a new sentence --
6              MR. JOSEPHS:  Yes, Your Honor.
7              THE COURT:  -- based on current considerations too?
8              MR. JOSEPHS:  Well, Your Honor, the government doesn't
9    think you need to consider anything else.
10             THE COURT:  Well, I do.  Whether the government thinks
11   so or not --
12             MR. JOSEPHS:  But I understand where you're coming
13   from, Your Honor.
14             THE COURT:  -- the Supreme Court says we can take
15   those into account.
16             MR. JOSEPHS:  And Mr. Weinberg is correct that the
17   Court can take into account post-sentencing information.
18             THE COURT:  So what do you think, Mr. --
19             MR. PINALES:  I agree.  I think Pepper is --
20             THE COURT:  Don't you have any opinions?
21             MR. PINALES:  I do have some, even on this case, Your
22   Honor.  I think that --
23             THE COURT:  His glasses get steamed up when he's
24   talking.
25             MR. PINALES:  I won't go there.
```

 1        I think that the remand is a complete resentencing.

 2            THE COURT:  Okay.

 3            MR. PINALES:  I think *Pepper* says you can take into

 4    consideration everything now, including since sentencing to the

 5    date of the new sentencing.

 6            THE COURT:  That's what I want to know about.

 7            MR. PINALES:  So I believe --

 8            THE COURT:  Anything good happen to your client?

 9            MR. PINALES:  She's still living.  She's -- I speak to

10    her occasionally, and some days are very good and some days are

11    not.

12            THE COURT:  Is it any different for you and me?

13            MR. PINALES:  No, Your Honor.  Her doctor, latest

14    report that I got -- and I do hear from him periodically -- is

15    she seems to be stabilized now.  She is having a very difficult

16    time financially.  I mean, she has -- she's trying to live off

17    of --

18            THE COURT:  Money she had hidden in the safe?

19            MR. PINALES:  No.  She has no safe; she has no money

20    hidden.  She's trying to live off of what little social

21    security she and her boyfriend are getting.

22            THE COURT:  What does she get, 650 a month?

23            MR. PINALES:  Something like that, Your Honor.

24            THE COURT:  And he gets some too?

25        You probably know that.  What's the name of the young lady

```
 1    that has this case, the probation officer?

 2              MR. FROMMEYER:  Laura Jensen.

 3              THE COURT:  Laura.  I guess I get -- I've been getting

 4    monthly reports from her.

 5              MR. FROMMEYER:  Yes.

 6              MR. PINALES:  Right.

 7              THE COURT:  It actually looks like a report from her

 8    checkbook.

 9              MR. PINALES:  "I spent this much on groceries and this

10    much here."

11              THE COURT:  Absolutely.  That's all there --

12              MR. PINALES:  I know; I know.  So she is -- she's

13    having a very difficult time and has basically, because of her

14    health --

15              THE COURT:  What is her difficulty, just financially,

16    or healthwise?

17              MR. PINALES:  Financially.  But she stays at home.  I

18    mean, she really -- she's not confined to her home, but she

19    is --

20              THE COURT:  Where is she living?

21              MR. PINALES:  She's living across the river with Jimmy

22    Doyle, her --

23              THE COURT:  Who is, really, Jimmy Doyle?

24              MR. PINALES:  He's been a boyfriend.  I mean --

25              THE COURT:  Okay.  That's all right.
```

11

```
 1              MR. PINALES:  I don't like to use the word
 2    "boyfriend."  He's a man friend.
 3              THE COURT:  Well, you're complimenting her.
 4              MR. PINALES:  And I'll tell you, she's very fortunate
 5    that he's been around, because, obviously, she can't drive,
 6    can't get to the doctor without him.
 7         He probably shouldn't be driving, but he gets her to the
 8    doctor, gets her --
 9              THE COURT:  Don't say things like that.  How old are
10    you?
11              MR. PINALES:  I'm 68, Your Honor.
12              THE COURT:  Okay.
13              MR. PINALES:  I'll be 69 in a couple of months.
14              THE COURT:  Okay.  Go ahead.
15              MR. PINALES:  God willing.
16              THE COURT:  I'm supposed to say that, not you.
17              MR. PINALES:  I can say that, because I need all the
18    help I can get.  And so she's very fortunate to have him,
19    really.  I think that without him she would not -- I wouldn't
20    be talking.
21              THE COURT:  Has she visited her son at all?
22              MR. PINALES:  She has gone on a regular basis to visit
23    with him.
24              THE COURT:  Where is he, down near Ashland?
25              MR. PINALES:  Used to be.  He's up --
```

```
 1              MR. WEINBERG:  He's near Youngstown.

 2              MR. PINALES:  Yeah.

 3              THE COURT:  Youngstown?

 4              MR. WEINBERG:  Yeah.  The BOP sent him from West

 5    Virginia to northeastern Ohio.

 6              THE COURT:  Is that a new facility up there?

 7              MR. WEINBERG:  I don't think it's new.  It's Elkton.

 8              MR. FROMMEYER:  Elkton, yeah.  Your Honor, it's

 9    probably eight or nine years old.

10              THE COURT:  What level security is it?

11              MR. FROMMEYER:  Well, there's different -- the

12    campus --

13              THE COURT:  They have different varieties?

14              MR. FROMMEYER:  Yeah.  Yeah, they have different

15    security levels there depending.  They have a camp and they

16    have the low depending on -- you know, sometimes the camp and

17    all that is right outside.

18              THE COURT:  They do have a camp?

19              MR. FROMMEYER:  They have a low security --

20              MR. WEINBERG:  He's in a low, Your Honor.  He'd been

21    transferred from a medium that he went to because of the -- he

22    had so many years left, and then he went into a low.  But he's

23    been regularly visited by Harriet and by his wife and kids.

24              THE COURT:  Did you see the very appealing letter he

25    wrote me?
```

13

1           MR. WEINBERG:  He sent me a copy, yes, Your Honor.

2           THE COURT:  Did you all get a copy of it?

3           MR. FROMMEYER:  No, we did not, Your Honor.

4           THE COURT:  Well, I've got to find it somewhere.  I

5  think counsel for the government should have it, or at least

6  probation should have it.

7           MR. WEINBERG:  Okay.  I will make sure that --

8           THE COURT:  Okay.  I think the government should have

9  it too.

10     Now, Mr. Weinberg -- well, how -- I've left her out.  And

11  what did I sentence her to?

12          MR. PINALES:  Two years.

13          THE COURT:  Two years.  And she's how old, 77?

14          MR. FROMMEYER:  She's 77.

15          MR. PINALES:  77, yeah.

16          MR. FROMMEYER:  She'll be 78 in December.

17          THE COURT:  And she's been a very good defendant since

18  she was sentenced?

19          MR. PINALES:  Yes, she has.

20          THE COURT:  Okay.

21          MR. PINALES:  I mean, I think she --

22          THE COURT:  That will be up to the probation depart-

23  ment to advise, of course.

24          MR. FROMMEYER:  (Nods head up and down.)

25          MR. PINALES:  Uh-huh.

<sup>14</sup>

1          THE COURT:  Why don't you do a presentence report over

2    again.

3          MR. FROMMEYER:  Okay.

4          THE COURT:  Well, you know, it's an amendment to it

5    based on remand.

6          MR. FROMMEYER:  Would you like an addendum covering

7    all that, or would you like a whole new report?

8          THE COURT:  I don't think I need a whole new report,

9    do I?  I just need the addendum from the time I sentenced him

10   and her up to the present time.

11         MR. FROMMEYER:  We can do that.

12         THE COURT:  And the considerations that I can take

13   into account --

14         MR. FROMMEYER:  Right.

15         THE COURT:  -- on the law that's been developed since

16   then.

17         MR. FROMMEYER:  Uh-huh.

18         THE COURT:  The ball's in your court, Mr. Weinberg.

19         MR. WEINBERG:  No, I agree.  I think what -- Mr.

20   Warshak's very different, you know, attitude since he went to

21   jail.  He understands what he did.  He understands the harm he

22   caused his mother and the harm he caused his wife and children

23   and everybody and, you know, wishes he had to do it over again.

24   You don't get second chances in the system.  But he has learned

25   a humbling lesson by being in prison.

1          THE COURT:  So anything I do less than life would be a

2    variance?

3          MR. FROMMEYER:  Yes, Your Honor.

4          THE COURT:  Or a departure?

5          MR. FROMMEYER:  Right.

6          THE COURT:  Yes which, or both?

7          MR. FROMMEYER:  Both.  Well, you could actually do

8    both or you can do one or the other.

9          THE COURT:  Well, no.  I think there's a distinction.

10         MR. FROMMEYER:  There is.

11         THE COURT:  Departure is within the --

12         MR. FROMMEYER:  The Guidelines.

13         THE COURT:  -- within the Guidelines.  A variance is

14    below the Guidelines, above or below the Guidelines.

15         MR. FROMMEYER:  A variance is any reduction or

16    increase that is not Guideline based.

17         THE COURT:  Well, that would sort of be like the

18    *Pepper* case.

19         MR. FROMMEYER:  That would be correct.

20         THE COURT:  It would take it all into account.

21         MR. FROMMEYER:  Right.  Yes, Your Honor.

22         THE COURT:  Okay.  I'd like probation's view of that.

23         MR. FROMMEYER:  We will give you a -- as part of the

24    addendum to that, we'll add a recommendation.

25         THE COURT:  Okay.

1          MR. FROMMEYER:  We'll talk about variance issues and

2     we'll talk about a recommendation so that you'll have our

3     opinion.

4          THE COURT:  I don't know.  Are you going to -- I'd

5     like a recommendation on the sentence for both of them.

6          MR. FROMMEYER:  We'll do it for both.

7          THE COURT:  Because I have ideas of what I'm going to

8     do.

9        What are the considerations, taking Warshak today, that

10    would warrant the variance?

11         MR. FROMMEYER:  Well, the big one, I would have to

12    say, is disparity in sentencing.  And depending on --

13         THE COURT:  You mean between him and the other people

14    that are getting --

15         MR. FROMMEYER:  No, between him and other defendants.

16         THE COURT:  In this case?

17         MR. FROMMEYER:  No.  Other defendants that had similar

18    conduct across the country or across the district.

19         THE COURT:  You mean he was hit heavier?

20         MR. FROMMEYER:  Yeah.  Yes, Your Honor.

21         THE COURT:  How do you provide on that?

22         MR. FROMMEYER:  Actually, we're doing a little

23    research on another separate case right now on some of that.

24    And, you know, the problem is is that the way the Guidelines

25    are formulated, in the 2B1.1 Guideline, the driving force

17

 1  behind that is the loss figure.  And what happens is, is that

 2  once you get to a certain point, the problem is is that you

 3  have the statutory maximum penalties and you have company --

 4  some frauds are a hundred million, some of them are 400

 5  million, some of them are in the billions.  And we've had --

 6  there's a case in the district that was in the billions of

 7  dollars.

 8          THE COURT:  Who was that?  Which case?

 9          MR. FROMMEYER:  It was a health care company out of

10  Columbus that -- and they recently -- and I think it's still in

11  the Sixth Circuit.  Some of this stuff's still in the Sixth

12  Circuit.

13          THE COURT:  Did Judge Marbley have that one?

14          MR. WEINBERG:  Yes.

15          MR. PINALES:  Yes.

16          MR. WEINBERG:  Yes, Your Honor.

17          MR. FROMMEYER:  And part of the problem that we are

18  having considering is is, well, when you're comparing a billion

19  to a hundred million, you know, there is some -- the weight

20  there, you're not getting any additional --

21          THE COURT:  What was the guy given up there who had

22  the billion?

23          MR. FROMMEYER:  Well, the top guys were getting 30

24  years on that, but they were also capped.  You kind of --

25  depending on how many counts they were convicted of, they were

18

1    capped at 30 years anyway because of the statutory maximum.

2    But if there's more than one count, you can kind of group them

3    and kind of separate the penalties out there and kind of get it

4    above there.

5        THE COURT:  I think that ought to be discussed too in

6    your --

7        MR. FROMMEYER:  Well, we're going to discuss that,

8    because like I said --

9        THE COURT:  Well, I think you should discuss also the

10    sentencing I did of the other defendants in this case.  The

11    only -- did anybody get more than two years?

12        MR. FROMMEYER:  No, Your Honor.  But no one was held

13    to the loss figure that -- no one was held to the loss figure

14    that Mr. Warshak was held to other than his mother, from my

15    understanding.  And so the reason why the sentences were so far

16    apart was, is they were only held for the count -- they were

17    held responsible for what they did, and because he was the head

18    of the whole company, he basically got the whole ball of wax.

19    And because of that, there were -- I mean, in the chain of

20    culpability, he was at the top.

21        THE COURT:  Okay.  I think you ought to discuss that

22    too in your recommendation or justification, recommendation,

23    whatever you call it, and also with her.

24        MR. WEINBERG:  Some of them I think were a hundred

25    million.

19

1          MR. FROMMEYER:  Were a hundred million, yes.

2          MR. PINALES:  Yeah.

3          MR. JOSEPHS:  Yes.  And as Your Honor stated at

4    sentencing, you talked about that Steven Warshak was more

5    culpable than everybody else because he sort of drove the train

6    here, and the different sentences between Steve Warshak and the

7    people who pled guilty wasn't so much surrounding the loss

8    figure, because, frankly, if it was a hundred million or 400

9    million, it still would have been life in the Guidelines, and

10   Your Honor went under the Guidelines and imposed a 25-year

11   sentence.

12        And it's the government's view that nothing has changed and

13   that --

14          THE COURT:  Do you think there's a message that the

15   court of appeals was sending without ever saying it, but having

16   a feeling about these cases?

17          MR. JOSEPHS:  The government doesn't think so, Your

18   Honor, and that's simply -- I think they were --

19          THE COURT:  Did you do the Erpenbeck?  Was that

20   your -- do you remember I sentenced that guy --

21          MR. FROMMEYER:  Mark Grawe did that, and Pat was

22   around.  Pat Crowley was around for that.

23          THE COURT:  I sentenced him to 30 years, and I think

24   it got sent back.  Do you remember that at all?  What was the

25   remand on it?  Were you in that case?

20

```
 1            LAW CLERK SYLER:  Uh-huh.

 2            MR. PINALES:  No.  I just peripherally had a witness.

 3            THE COURT:  I transferred the case out because there

 4  was --

 5            MR. FROMMEYER:  Right.

 6            THE COURT:  -- one of the lawyers said that I was as

 7  dumb as a rock.

 8       (Laughter.)

 9            THE COURT:  Do you remember that?

10            MR. FROMMEYER:  Well, Your Honor, but there was some

11  shenanigans.

12            THE COURT:  I didn't want to build another bridge.

13            MR. FROMMEYER:  There were some extra shenanigans that

14  were going on in that case.

15            THE COURT:  Erpenbeck.

16            MR. FROMMEYER:  Erpenbeck.

17            THE COURT:  Because of his old man?

18            MR. FROMMEYER:  Because of the obstruction and all

19  that that was happening with the planning, and they were trying

20  to tamper with a witness.

21            THE COURT:  Oh, yeah.

22            MR. FROMMEYER:  And then, of course, the father trying

23  to -- there was --

24            THE COURT:  All the reason -- when it went bad, I

25  turned the case over to Sandy -- Judge Beckwith -- and I think
```

1    she sentenced him then to 25 years.  It didn't really make

2    terribly much difference.

3            MR. FROMMEYER:  Well, and then they found out just

4    recently that he had actually buried some money in the golf

5    course.

6            THE COURT:  I was asking my law clerk what happened

7    over there, and I was explaining I had a similar case -- it

8    wasn't my case, it was another judge's case -- where somebody

9    during the presentence investigation pled guilty to a fraud

10   charge and, it turned out, didn't reveal property that the

11   person owned in Canada.  And as I recall, the case came back, I

12   think, to Judge Beckwith.

13       I don't know if there was another criminal charge against

14   the guy or for lying to an agent or whatever, but she sentenced

15   him to 25 -- 200 -- two and a half years -- or 25 months,

16   rather.

17       Do you know the case I'm talking about?

18           MR. FROMMEYER:  No, I'm not.  No, I don't, Your Honor.

19           THE COURT:  And Erpenbeck, I wonder whether -- if

20   there's any charge placed against him for the money that was

21   buried.  What was it, about $350,000?

22           MR. PINALES:  I think it's under investigation still.

23           MR. FROMMEYER:  Yes, I think it is.

24           THE COURT:  No, I thought somebody --

25           MR. PINALES:  I think the brother who helped dig the

22

```
 1    hole and bury it may have been charged.

 2              THE COURT:  And the owner of the property.

 3              MR. PINALES:  That I don't know.  But I think the

 4    brother was.  And the funny part about it is all the money had

 5    disintegrated, anyway, and couldn't be used.

 6              THE COURT:  I think that the treasury department has

 7    techniques to determine -- to try and bring it back to the

 8    point where they recognize it as being currency.

 9              MR. PINALES:  Oh, I think so.  But he had no means of

10    digging it up and using it.

11              THE COURT:  Do you remember before it all got finally

12    dug up there was a rumor about it, and I guess the feds. were

13    all over the place digging up the guy's lawn.

14              MR. PINALES:  My son's father-in-law was playing golf

15    when the tractor-trailers came in and unloaded all the bull-

16    dozers, and he didn't know what was going on.

17              MR. FROMMEYER:  I think that's across the river.

18              MR. PINALES:  Across the river in Kentucky, yeah.

19              THE COURT:  Summit Hills or something like that.

20              MR. PINALES:  Something like that.  I don't know the

21    name.

22              THE COURT:  One of the guy's -- one of Erpenbeck's

23    beautiful homes was right on the edge of the property at a

24    country club.  Well, I wondered if -- nothing was done to

25    Erpenbeck, but he's put away for 25 years.
```

23

1    MR. FROMMEYER:  Yeah.  So we're going to have a tough

2  time making similarities between this case and his case because

3  of all -- some of the extra stuff that was going on.

4    THE COURT:  The extra stuff that you don't know about,

5  his father was a mean son of a bitch, if you excuse my expres-

6  sion, and everybody in northern Kentucky knew it.  And he and

7  Erpenbeck --

8    Off the record for a second.

9    (Discussion off the record.)

10    THE COURT:  You can go back on the record.

11    Do you think the court of appeals was trying to say some-

12  thing in that case, whether sentencing somebody to 20 to 30

13  years who had no real violence in their background, were not

14  career criminals in the sense, so forth, of the thing, that's a

15  little much?

16    MR. FROMMEYER:  Well, without being a lawyer, Your

17  Honor --

18    THE COURT:  Okay.  You're not, I know.

19    MR. FROMMEYER:  Okay?  -- from probation's perspec-

20  tive, we do see that the courts are wanting more justification

21  in why the Court is doing or deciding a certain sentence.  The

22  3553(a) factors which are a part of the sentencing, that is the

23  thing that there is a lot of attention being paid to, is is

24  there enough to support the decision, is there enough record to

25  support the decision that you're making.  And that is the clear

24

1   message that everyone is getting, and that's what we're trying

2   to do to help provide in some of the language and the variance

3   language and things that we're suggesting in the report, but

4   also in our recommendations to give the Court some --

5           THE COURT:  Well, one of the major things is to

6   protect society from any further criminal activity on the part

7   of the defendant.  And in talking about his client

8   (indicating), there's probably very little.

9     And as far as Warshak, I suspect he probably learned his

10   lesson.  I don't know.  But I think when you're writing these

11   things up you might take those into consideration.

12           MR. FROMMEYER:  (Nods head up and down.)

13           THE COURT:  I don't believe, frankly, as a human being

14   and as a judge that putting people away for lengthy periods of

15   time accomplishes a damn thing.  I've been told by prison

16   administrators, after somebody's been in prison for two years

17   or so -- and Judge Porter used to tell me this -- they sour on

18   life and they aren't -- as a human being they're not worth a

19   damn, getting out, because they can't get a job, they really

20   aren't trained for anything, and they just become a drag on

21   society if they don't get in trouble again.

22     But sending them to prison for a couple of years where they

23   really have to get the message and checking to see if they

24   really sincerely have made efforts to rehabilitate themselves

25   is something -- well, after this case here, it gives the judge

```
 1    an opportunity to take some of that into account.

 2         Now, that's what kind of stuff I'd like to get back on

 3    Steve Warshak, and I'll leave it up to you.  The same thing on

 4    Mrs. Warshak.

 5         Is there anything we need to talk about further on that?

 6              MR. WEINBERG:  No, Your Honor.

 7              THE COURT:  I guess I can set a sentencing date.

 8              MR. WEINBERG:   (Nods head up and down.)

 9              THE COURT:  I think I need briefing on all of this

10    from you all so I have something to rely on.

11              MR. JOSEPHS:  Certainly, Your Honor.

12              THE COURT:  How much time do you think you need?  You

13    know what I'm thinking about.  The briefing can be very simple

14    and very short and to the point.  You may be able to both put

15    on some sort of agreed agreement I can put of record as to what

16    the remand allows me to do.  I don't think that prejudices the

17    government.  But you might have, each side might have some

18    views about what the sentence should be.

19              MR. PINALES:  Could we defer that brief until after we

20    see the presentence report?  Which I think will give us

21    something to look at, and especially on the from then to now

22    issues.

23              MR. FROMMEYER:  Well, and there will be some variance

24    issues with disparity in sentencing that will be new.  I mean,

25    obviously there was some -- a variance already that was granted
```

26

1   by the Court, but there's a -- and some of the disparity in

2   sentencing was one of the issues.  But maybe that could be

3   expounded upon a little bit further based on what's happened

4   since then.

5          THE COURT:  I think I just recently sentenced somebody

6   that I think shook up the prosecution, because I sentenced him

7   to a year and a day when he -- I think the minimum that he

8   could be sentenced was two years because of disparity in

9   sentencing.  And the same with Corsmeier.

10         MR. FROMMEYER:  Stephanie Corsmeier.

11         THE COURT:  Yeah.  She was the fall person in that.

12  She didn't get anything out of it economically.

13         MR. FROMMEYER:  Right.

14         THE COURT:  And I think she was taken advantage of by

15  some guys.

16         MR. FROMMEYER:  Right.

17         THE COURT:  But the guys pled guilty, and I tried her.

18  And it came back because I let some evidence in that they

19  thought shouldn't have been in that was prejudicial on whether

20  or not she was doing cocaine and that's why she got befuddled.

21    At any rate, they sent it back for resentencing.  And I

22  think probation's recommendation was something like, somewhere

23  in the -- what was it, probably --

24         MR. FROMMEYER:  Well, Your Honor, in that case, if you

25  recall --

1           THE COURT:  Was that your case?  Do you remember the

2  facts?

3           MR. FROMMEYER:  Well, what I remember about --

4           THE COURT:  I'm talking to the clerk behind you.

5           MR. FROMMEYER:  Oh, I'm sorry.

6           THE COURT:  Her name is Chandra Napora.

7           LAW CLERK NAPORA:  The defense and the government in

8  that case had come to an agreed sentence of 18 months.  But

9  probation's recommendation I think was --

10          THE COURT:  That's right.

11          LAW CLERK NAPORA:  -- closer to 24.

12          THE COURT:  Well, the disparity in sentencing between

13  her, if they're recommending, and even agreed to, was even

14  higher than the principals who made a bundle of dough out of

15  the thing and pled guilty.  And I put in the reason for doing

16  it because I thought the disparity was warranted.

17    She had a baby, and she was out on bond.  She had a baby

18  and she was doing a good job, according to everybody.  And I

19  don't know if the government's going to appeal it or not, but I

20  think it shook them up a little bit.  Because her lawyer, they

21  had agreed to -- I think she was psychologically prepared to do

22  18 months, but a year and a day gives her a break in all kinds

23  of ways, I think.

24    All right.  Well, I think you all understand what I want to

25  do.  So when do you think you can get your report in?

28

```
 1              MR. FROMMEYER:  Your Honor --

 2              THE COURT:  What are you laughing for?

 3              MR. PINALES:  I just heard a sigh.

 4              THE COURT:  You're just laughing because I put it on

 5    their back and not on yourself.

 6              MR. FROMMEYER:  I'm speaking for somebody else, but,

 7    you know, in fairness --

 8              THE COURT:  Well, if it's going to go back, will you

 9    explain to her?

10              MR. FROMMEYER:  Yes.  And --

11              THE COURT:  We ought to have a transcript of this made

12    too.

13              MR. FROMMEYER:  30 days --

14              THE COURT:  Okay, that's fine.

15              MR. FROMMEYER:  -- for her to do it.

16              THE COURT:  Can you type it up for me.

17              MR. FROMMEYER:  And then, in fairness --

18              THE COURT:  Well, then you talk -- in the 30 days then

19    you have got to go through your routine.  You talk to counsel,

20    present them with a -- and then they have a chance to object to

21    it and come back.

22              MR. FROMMEYER:  Right.  And that's what I was going to

23    propose.  If we could have 30 days to go through the records,

24    because there may be some interviews that need to be done or

25    that.
```

29

```
 1              THE COURT:  Oh, sure.
 2              MR. FROMMEYER:  And after the 30 days if we could
 3    disclose that to the parties and let them have a couple of
 4    weeks to kind of look at it and see what they want to do with
 5    it and if they want to file anything in response.
 6        And then, you know, I don't know if we want to go through a
 7    whole objection process or if you guys are just going to file
 8    sentencing memorandums or --
 9              THE COURT:  Oh, I'm sure they'll want to file a
10    sentencing memorandum based on --
11              MR. PINALES:  I want to see what you do.
12              THE COURT:  They may agree with you.  They might agree
13    with what you come up with; they may not.
14              MR. FROMMEYER:  Right.  Well, that's why the two
15    weeks.  And then if there's objections, we would need a couple
16    of weeks to kind of resolve, try to resolve them if that isn't
17    resolved.  Then we can get in a final.
18        So what I'm saying is is we could have the report and
19    everything revolving around attorneys maybe in -- you know,
20    with you guys, are you okay with the two weeks and then maybe a
21    two-week turnaround time?
22              MR. WEINBERG:  (Nods head up and down.)
23              MR. FROMMEYER:  Okay.  So that would be two months,
24    and then --
25        We could have a report to the Court in 60 days.
```

 1              THE COURT:  Okay.  Well, is that cutting it short for

 2      you?  I was going to say August 1st.  Is that 60 days?  You've

 3      got May, June and July.

 4              MR. PINALES:  It's a little bit longer, which is

 5      better for my schedule.

 6              THE COURT:  August 1st.

 7              MR. FROMMEYER:  Okay, sure.

 8              THE COURT:  August 1st.

 9              MR. FROMMEYER:  Okay.

10              THE COURT:  And schedule the sentencing sometime in

11      September.  Is that all right?

12              MR. WEINBERG:  Sure.

13              MR. FROMMEYER:  So we'll try to get the report out in

14      30 days, and then we'll go from there.

15              MR. WEINBERG:  Okay, great.

16              THE COURT:  Mr. Josephs, did you come down from

17      Washington?

18              MR. JOSEPHS:  Yes, I did, Your Honor.

19              THE COURT:  I'm surprised.  You've got a lot of

20      colleagues that are listed as receiving that opinion.

21              MR. JOSEPHS:  Well, the main two that were on the

22      trial team, Your Honor, are out of town.

23              THE COURT:  Oh.  Did you notice all the lawyers on the

24      opinion, on the back?  Somewhere around here I've got it.

25              MR. PINALES:  We have the weight of the government

1    against us, Your Honor.

2            THE COURT:  Don't you always.

3            MR. PINALES:  Don't I always, yes.  Then I go home.

4            THE COURT:  Well, don't blame your wife like I blame

5    mine.

6            MR. PINALES:  I'm not blaming her.  I'm crediting her

7    for keeping me straight and narrow.

8            THE COURT:  Let's see who all of them are.  I was

9    surprised.  Were there any amicus briefs filed or anything like

10   that?

11           MR. PINALES:  Do you know?

12      There was.  There was an amicus, yes.

13           MR. JOSEPHS:  About the 2703 issue.

14           MR. WEINBERG:  The electronic --

15           MR. PINALES:  I remember that.

16           THE COURT:  I thought I read a scholarly brief or

17   scholarly opinion, so --

18           MR. PINALES:  It could have been a little more

19   scholarly.

20           MR. WEINBERG:  Well, he's very scholarly.

21           THE COURT:  Well, I don't know where I -- I saw the

22   list of people that got it.

23      I can't find the list of the people.  Maybe it's in the

24   front here.

25      Okay.  Well, I was surprised that so many people in the

```
 1   government and various departments of the government.  Let me

 2   see if I --

 3          MR. JOSEPHS:  There were a few involved, Your Honor.

 4          THE COURT:  Where would they have listed who got

 5   copies of it?  I saw it here.

 6      Oh, here it is.  Have you met any of these people?  Kevin

 7   Bankston.

 8          MR. WEINBERG:  Kevin I have.  He's the amicus from

 9   California.

10          THE COURT:  Oh, he's the amicus.

11          MR. WEINBERG:  Yeah.

12          THE COURT:  Which way was he going, your way or --

13          MR. WEINBERG:  My way.  He's from the Electronic

14   Frontier Foundation and wrote some briefs.

15          THE COURT:  He's out in San Francisco.

16          MR. WEINBERG:  Yeah.

17          THE COURT:  Jenny Ellickson?  I don't remember meeting

18   Jenny Ellickson.  Department of Justice, Computer Crime and

19   Intellectual Property.

20          MR. JOSEPHS:  Yes, one of the criminal divisions in

21   D.C.

22          THE COURT:  Ben Glassman, Bob Goldstein, Dave Greer,

23   Mark Josephs.  You're here.

24      Nathan Judish, who is that?

25          MR. WEINBERG:  I think he's a --
```

33

```
 1            MR. JOSEPHS:  Computer section.

 2            THE COURT:  Hmm?

 3            MR. JOSEPHS:  He's in the criminal division.

 4            MR. WEINBERG:  He's a Washington lawyer that's in the

 5  computer section.

 6            MR. PINALES:  The DOJ.

 7            MR. WEINBERG:  I was talking to him about the e-mail

 8  issues.

 9            THE COURT:  What kind of a Washington lawyer?

10            MR. WEINBERG:  He's in the Department of Justice

11  computer section.

12            THE COURT:  Oh.

13            MR. JOSEPHS:  He just addressed the e-mail issues.

14            THE COURT:  Okay.  Well, I was just surprised.

15       Do you know Linda Martin?

16            LAW CLERK SYLER:  No.

17            THE COURT:  Okay.  She's a secretary of the clerk in

18  the court of appeals.

19         (Discussion off the record.)

20            THE COURT:  All right.  I think that's pretty much

21  what I wanted to cover today to make sure where I was and what

22  we can do and what we can't do.

23       Anything further from the justice department?

24            MR. JOSEPHS:  No, Your Honor, except for the fact --

25            THE COURT:  Hmm?
```

1      MR. JOSEPHS:  -- except for the fact that the

2 government believes that the sentences were appropriate and

3 still does.

4      THE COURT:  There's no what?

5      MR. JOSEPHS:  That the government believes that the

6 sentences were appropriate and still believes that.

7      THE COURT:  Well, I would think so.

8    I'm not going to ask you.

9      MR. FROMMEYER:  (Shakes head from side to side.)

10      THE COURT:  I'm not going ask you, Mr. Weinberg.

11      MR. WEINBERG:  It was nice seeing you again, Judge.

12 Thank you.

13      THE COURT:  I was going to say, how's your forehand?

14 Do you play tennis?

15      MR. WEINBERG:  I do; I do.  Not well, though.  I used

16 to play a lot.

17      THE COURT:  What's your handicap in golf?

18      MR. WEINBERG:  No handicap.  No golfer.

19      THE COURT:  What kind of a boat do you have?

20      MR. WEINBERG:  No boat.

21      THE COURT:  You live in Boston?

22      MR. WEINBERG:  Yeah.

23      THE COURT:  What do you do all day?

24      MR. WEINBERG:  Go to Fenway Park and I run.

25      THE COURT:  Oh, you do?

```
 1          MR. WEINBERG:  I live three houses off the marathon

 2   course, and that's what I do for exercise.

 3          THE COURT:  Oh, that's great.  You look great.

 4      And this one here, what have you been up to that you can

 5   talk about?

 6          MR. WEINBERG:  I used to play a lot of tennis until my

 7   calf separated.

 8          MR. PINALES:  Just I'm enjoying practice.  I'm having

 9   a good time.

10          THE COURT:  You're over at Strauss Troy?

11          MR. PINALES:  Strauss Troy, yeah.  I love it.

12          THE COURT:  They're nice guys over there.

13          MR. PINALES:  Yeah.

14          THE COURT:  They're real good lawyers.

15      Okay.  Thank you all for coming in.

16          MR. PINALES:  Thank you, Judge.

17          MR. JOSEPHS:  Thank you, Your Honor.

18          THE COURT:  Keith, I think we should put out some sort

19   of a memorandum order; not the conference so much but just the

20   timetable.

21          LAW CLERK SYLER:  Yes.

22          THE COURT:  So they'll know.  And we can put a

23   scheduling --

24      Do you think September would be appropriate for sentencing?

25          MR. WEINBERG:  That would be great.
```

1          MR. PINALES:  That's fine with me.

2          MR. JOSEPHS:  And Your Honor would want briefs before

3    then; right?

4          THE COURT:  Yeah.  Everything should be completed by

5    then.

6          MR. JOSEPHS:  Right, right.

7          THE COURT:  I want whatever you've got so I can see

8    it.

9          MR. PINALES:  Thank you, Judge.

10          THE COURT:  Okay.  Thank you.

11      (Proceedings concluded at 2:45 PM.)

12                        - - -

13                  C E R T I F I C A T E

14          I, Luke T. Lavin, RDR, CRR, the undersigned, certify

15    that the foregoing is a correct transcript from the record of

16    proceedings in the above-entitled matter.

17

18                          s/Luke T. Lavin
                            _____
                            Luke T. Lavin
19                          Official Court Reporter

20                        - - -

21

22

23

24

25